# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

THE AMERICAN COAL SALES
COMPANY,                           :

                                    :       **Case No. 2:06-cv-94**

           **Plaintiff,**

                                      :       **Judge Holschuh**

     **v.**

                                      :       **Magistrate Judge Abel**

NOVA SCOTIA POWER INC.,

                                      :

           **Defendant.**

                                      :

## MEMORANDUM ORDER AND OPINION

Plaintiff The American Coal Sales Company ("Plaintiff") brought this diversity action to attempt to remedy Defendant Nova Scotia Power Inc.'s ("Defendant") alleged breach of contract, unjust enrichment, and fraud. The dispute arises out Defendant's refusal to pay $639,413.30 that Plaintiff alleges is due under a contract for the purchase of coal from Plaintiff's mine in southeastern Ohio. This matter is before the Court on the parties' cross-motions for summary judgment (docs. # 24, 30), as well as Plaintiff's Motion to Strike Affidavit of Allison Donnelly (doc. # 43) and Defendant's Objections (doc. # 60) to Magistrate Judge Abel's Order (doc. # 58), which resolved Plaintiff's Motion in Limine and to Strike Defendant's Sixth Affirmative Defense (doc. # 34), Plaintiff's Motion for Protective Order (doc. # 44), Plaintiff's Motion to Strike Affirmation (doc. # 46), and Defendant's Motion to Compel (doc. # 49). Additionally, Plaintiff has moved for oral argument on the cross-motions for summary judgment (doc. # 64), but the Court finds that oral argument is not essential to the fair resolution of these motions, see S.D. OHIO CIV. R. 7.1(b)(2), and thus **DENIES** Plaintiff's motion for oral argument.

For the following reasons, Defendant's Objections to Magistrate Judge Abel's Order are

**OVERRULED**.  Plaintiff's Motion to Strike Affidavit is **GRANTED**.  Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.      Background

### A.      The Parties

Plaintiff is an Ohio corporation and an indirect subsidiary of the Murray Energy Corporation, and is engaged in the business of selling coal.  (Dep. of Robert Murray p. 6-10, Def. Mot. Summ. J. ex. B, doc. # 33 ("Murray Dep.").)  Plaintiff is not itself involved in actually mining coal; rather, Plaintiff negotiates contracts for the sale and transportation of all the coal produced by the various mines throughout southeastern Ohio and eastern Kentucky that other Murray Energy Corporation subsidiaries own and operate.  Plaintiff's CEO is Robert Murray, who reviews and approves solicitations for the sale of coal and who also helps to resolve significant sales and customer service issues.  (Id. at 12.)  Plaintiff's day to day operations are handled by its President B.J. Cornelius ("Cornelius") (Dep. of B.J. Cornelius p. 11, Def. Mot. Summ. J. ex. A, doc. # 33 ("Cornelius Dep.")) and by William Hollars ("Hollars"), Plaintiff's Vice President of Contract Administration and Sales, who is responsible for selling coal and negotiating contracts in the northern and northeastern United States and Canada (Dep. of William Hollars p. 16-17, doc. # 28 ("Hollars Dep.")).

Defendant is a Canadian electrical utility company based in Halifax, Nova Scotia.  Defendant purchases coal from various suppliers and burns it to produce electricity, which it then sells to residential, commercial, and industrial clients.  Defendant's Procurement Manager and Solid Fuels Manager are responsible for the day to day business of determining how much coal Defendant must purchase for any given year, while Defendant's Director of Fuels, Energy and Risk Management is

responsible for the overall fuel procurement strategies. Allison Donnelly ("Donnelly") was initially Defendant's Procurement Manager and Solid Fuels Commercial Manager (Donnelly Aff., doc. # 41-4), and then Colin Thomson ('Thomson") assumed those roles in February 2005 (Dep. of Colin Thomson p. 58, doc. # 25 ("Thomson Dep.")). Mark Sidebottom ("Sidebottom") is Defendant's Director of Fuels, Energy and Risk Management (Dep. of Mark Sidebottom, p. 5-6, doc. # 26 ("Sidebottom Dep.")).

### B.      The Parties' Contract

#### 1.      Formation

In early 2004 Defendant issued a request for proposals and solicited bids for the sale of coal during 2005. Plaintiff responded to Defendant's solicitation and bid 200,000 tons of coal at $41.10 per ton.  (Def. Mot. Summ. J. ex. H, doc. # 31.)  Defendant responded to Plaintiff's bid and submitted a proposed contract, which Plaintiff quickly rejected as a "nonstarter." (Cornelius Dep. p. 45, 54.)  Plaintiff submitted its own proposed contract, however, and, after negotiations related primarily to Defendant's request for a letter of credit (which ultimately was not provided), the parties signed a contract in December 2004 ("the Contract").  (Contract, Def. Mot. Summ. J. ex. G ("Contract").)  Hollars, overseen by Cornelius and Murray, was primarily responsible for negotiating the Contract for Plaintiff.  (Cornelius Dep. p. 76.)  Donnelly negotiated the Contract for Defendant. (Donnelly Aff., doc. # 41-4.)

#### 2.      Terms

The relevant terms of the Contract state that "[Plaintiff] shall deliver and [Defendant] shall accept approximately 200,000 tons of coal" at a price of "$41.10 per ton fob in the vessel at the port of Baltimore."  (Contract at ¶¶ 4, 7.)  The Contract does not specify exact delivery dates, but states

that "[d]eliveries will be spread out evenly through the year unless the parties mutually agree otherwise." (Id. at ¶ 4.) Paragraph 3 of the Contract governs delivery, and states in relevant part that "[Plaintiff] shall transport the coal from the mine by railcar to the port of Baltimore and transfer the coal from the railcar into [Defendant's] vessel. The load port terms of the Consol Energy Baltimore Terminal shall apply to the Parties in respect of the transaction . . . ." (Id. at ¶ 3.) The Contract also contains a force majeure provision, which states:

> Neither [Defendant] nor [Plaintiff] shall be in default for failure to perform its obligations under this Purchase Order if such failure is caused due to events beyond its reasonable control including act of God, labor difficulties, strikes, equipment failure, fire, war, and power plant outage. The provisions of this clause shall not apply unless the party wishing to be relieved from liability has, promptly after the occurrence of the event or circumstance giving rise to the Force Majeure claim, notified the other party of its intention to claim relief, used all reasonable endeavors and continues to use all reasonable endeavors to rectify the event or circumstance giving rise to the Force Majeure claim and to minimize the damage caused by it. Initial notice of Force Majeure may be given orally, however, written notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible.

(Id. at ¶ 11.) Furthermore, the Contract provides that, in the event of Plaintiff's failure to perform for any reason other than force majeure, Plaintiff "will pay to [Defendant] an amount equal to the difference between the cost of replacing the non-delivered quantity and the contract price, if any." (Id. at ¶ 12.)

The "load port terms of the Consol Energy Baltimore Terminal" ("the Load Port Terms") referenced in paragraph 3 of the Contract were attached to the Contract as Schedule II. The Load Port Terms contain extensive provisions governing the duties and responsibilities of coal shippers, i.e. entities shipping coal to the terminal, and the responsibilities of the "Consol Energy Baltimore Terminal," more commonly referred to by its proper name of CNX Marine Terminals, Inc. ("CNX"). CNX is a subsidiary of the Consol Energy corporation and provides "coal transshipment services:"

that is, CNX transfers coal from a shipper's railcars onto oceangoing vessels harbored at the Port

of Baltimore. (Dep. of Regis Peternel p. 6, doc. # 23-2 ("Peternel Dep.").) In relevant part, the Load

Port Terms state that the shipper must schedule a vessel to arrive at CNX, must "nominate" that

vessel to CNX as the performing vessel within a certain timeframe, and must, within certain time

restraints, request a "laycan" period for vessel loading in advance of the vessel's arrival. (Contract,

Schedule II at ¶ 1.0.) The other provisions of the Load Port Terms relating to tendering notices of

readiness, vessel specifications, laytime exceptions and demurrage rates are not relevant to the

motions currently before the Court.

The Load Port Terms also contain a force majeure provision. (Id. at ¶ 11.0.) The Load Port

Terms force majeure provision, in relevant part, states that force majeure may excuse a party's

performance of its obligations (Id. at ¶ 11.2), but that "[e]ach party shall, in the event it experiences

a force majeure condition, use all reasonable efforts to eliminate the force majeure and/or the effects

thereof insofar as is practicable and economically feasible with all reasonable dispatch." (Id. at ¶

11.3.) The Load Port Terms also specifically state that "[t]he parties hereto shall use reasonable

efforts to schedule for makeup loadings any tonnages ("Force Majeure Tons") scheduled for loading

but not loaded at the Terminal due to events of force majeure suffered by either party." (Id. at ¶

11.5.)

### C. The Performance of the Parties' Contract

#### 1. The Attempted Initial Shipment

Defendant began attempting to negotiate the initial shipment under the Contract in early

January 2005, when Thomson emailed Hollars and stated that Defendant wanted to have the first

shipment of coal delivered to a vessel in mid-February. (Hollars Dep. p. 7, ex. 1.) Hollars relayed

this information to Ernie Thrasher ("Thrasher") at XCoal, a coal broker and transportation servicer that Plaintiff, pursuant to an unwritten, "gentleman's agreement" (Cornelius Dep. p. 107-8), used as an agent to ship coal from the mines in southeastern Ohio to CNX in Baltimore. (Id. at 105.) Plaintiff elected to use XCoal because Thrasher had existing contracts with both CNX and the Norfolk Southern railroad ("Norfolk Southern"), which was the only railroad that provided service from southeastern Ohio to Baltimore. (Cornelius Dep. p. 179.) Thrasher's existing contracts offered better service rates than Plaintiff could have obtained if it contracted directly with CNX and Norfolk Southern. (Id. at 138-39.)

After learning from Hollars that the parties were attempting to set up a mid-February vessel loading, Thrasher emailed Norfolk Southern representatives and attempted to obtain rail permits for five trains from the Century mine in southeastern Ohio (owned by a Murray Energy Corporation subsidiary) to CNX. (Dep. of Kenneth Joyner ex. 6, doc. # 36 ("Joyner Dep.").) Under Norfolk Southern's contracts with shippers like Thrasher and XCoal, shippers could not simply request a train on a specific date, but instead must submit a permit request, at least a month in advance of the desired train loading date, requesting that Norfolk Southern schedule a train to come to a mine site to load coal to be transported to a terminal such as CNX. Norfolk Southern, under its contracts, had the authority to honor or reject a permit request based on Norfolk Southern's train schedule and ability to deliver the train at the requested time. Norfolk Southern also reserved the right to restrict train loadings, even if they were permitted, if Norfolk Southern could not actually deliver the train on schedule. (Joyner Dep. p. 27-37.) Kenneth Joyner ("Joyner"), Norfolk Southern's Manager of Export and River Coal, and his supervisor, Dave Hrusovsky ("Hrusovsky"), Norfolk Southern's System Manager for the Coal Business Group, had the authority to accept or reject permit requests

and to restrict train loadings.  (Joyner Dep. p. 30.)

Hrusovsky received Thrasher's permit requests for five trains to CNX, responded the same day and rejected Thrasher's permit request: "We [Norfolk Southern] would not be able to commit to these loadings to make a vessel in late February.  We need a 2 month period to source 5 trains from Century at this time.  The January schedule to Baltimore is full. . . . I would not schedule a vessel until early April."  (Joyner Dep. ex. 6.)  Three days later, on January 10th, Hrusovsky emailed all Norfolk Southern customers that shipped coal to CNX, including Thrasher, and stated that, due to concerns about the slow pace of train unloading at CNX and the possibility of railline congestion, Norfolk Southern "reserve[d] the right to restrict permitted loadings for CNX if the pipeline to CNX becomes too full and fluidity is impaired[,]" and that Norfolk Southern "will restrict loadings during a month in order not to exceed the capacity of the line to the terminal."  (Joyner Dep. ex. 14.)

The same day, Thomson emailed Hollars and "officially nominated" the M/V Ambassador as the vessel that would load the first shipment of approximately 28,000 tons of coal.  Thomson said that the M/V Ambassador's ETA at CNX was February 17th, and requested a laycan of February 15th to the 24th.  (Hollars Dep. ex. 2.)  Hollars responded to Thomson and informed him that Norfolk Southern could not confirm train availability for February, but that it may be possible to schedule trains in March.  (Id.)  Thomson agreed to the change and requested a new laycan of February 27th to March 8th.  (Id. at ex. 3.)  Hollars then contacted Thrasher at XCoal and requested rail permits, and Thrasher submitted the permit request to Norfolk Southern.  (Id. at p. 30; Joyner Dep. ex. 18.)  On January 18th, however, Hollars emailed Thomson and informed him that Norfolk Southern was refusing to honor the permit requests and would not provide rail service.  Consequently, Hollars stated that Plaintiff could not provide a laycan for the M/V Ambassador

(Hollars Dep. ex. 4), and Thomson's nomination of the M/V Ambassador was never communicated to CNX. (See Joyner Dep. ex. 18, 30, 50 (Emails and CNX vessel schedules indicating that the M/V Ambassador was never scheduled for loadings at CNX).)

### 2. CNX's Operations

Norfolk Southern refused to honor Plaintiff's permit requests due to delays in unloading trains at CNX. Beginning in early January, temperatures in Baltimore and the surrounding areas dropped rapidly, and coal in trains at CNX waiting to be unloaded began to freeze. (Peternel Dep. p. 65.) When coal freezes in a railcar, it increases the time required to unload the coal and delays operations at CNX. Normally, when a loaded train arrives at CNX, processing and unloading begins by uncoupling two railcars from the train and taking those railcars into a small dumping building. Railcars are dumped in this building by fastening the railcars to the tracks and then inverting the floor of the building and the rail tracks, with the railcar attached, so that the railcar is upside down, allowing the coal to fall out. (Id. at 34.) The coal, which is normally no bigger than a golf ball and sometimes as fine as a powder, falls through a large grate with 18 inch by 18 inch openings into hoppers that funnel the coal onto a series of conveyer belts, which transport the coal to designated areas in CNX's storage yard or directly to a waiting vessel. (Id. at 35-43.) Normally, an entire train can be unloaded in as little as 4 to 5 hours, and CNX operates 24 hours a day.

When the coal is frozen in the railcar, however, the process takes considerably longer. Before entering the dumping building, the railcars must first be taken into a thaw shed. The thaw shed can accommodate up to four railcars and uses large radiant heaters to heat the bottoms and sides of the railcars. If the coal is merely frozen to the sides and bottoms then thawing can be relatively quick, but if the coal is frozen all the way through then it can take up to 15 minutes to

sufficiently thaw 4 cars to the point that they can be dumped. Thawing a 100 to 130 railcar train can become a time-consuming process. (Id. at 30-33, 41.)

Even when the coal is thawed enough to permit dumping, additional delays can occur. When the coal is dumped after thawing, chunks of frozen coal remain and it is still normally not small enough to fall through the grate into the hoppers. To get the coal to fall through the grate, CNX uses a "hammer mill," a large cylindrical drum with pieces of steel on the sides, to pound the coal into pieces small enough to fall through the 18 in. by 18 in. holes in the grate into the hoppers. Operating the hammer mill, like thawing railcars, is very time consuming. (Id. at 41.)

### 3. The Force Majeure Events at CNX and Norfolk Southern

As has been noted, during early January temperatures in and around Baltimore dropped precipitously. Coal in trains awaiting unloading began to freeze, and CNX began to experience delays in unloading trains due to the necessity of thawing railcars and operating the hammer mill machine. Whereas previously CNX could unload a train in approximately 4 or 5 hours, due to these delays CNX was only able to unload between 2 and 3 trains per day in January. (Id. at 89-90, 166.) These delays led to even more frozen coal, as trains loaded with coal kept arriving at CNX and were freezing solid while sitting on the tracks awaiting unloading. These delays in turn caused a backup and congestion in Norfolk Southern's raillines and limited train availability, as the majority of Norfolk Southern's railcars were stuck at CNX and could not be unloaded and made available for additional loading at mines. This prompted Norfolk Southern to limit additional coal loading and to refuse to honor new permit requests until the delays at CNX could be resolved. (Joyner Dep. ex. 20.)

As is often the case, the situation got worse before it got better. On January 19th, while still

laboring to unload the accumulated trains loaded with frozen coal, CNX experienced a "major equipment breakdown" when basketball-sized chunks of still-frozen coal that the hammer mill had not sufficiently broken up and that had passed through the grate and hoppers broke the steel cables in one of the conveyer belts and tore a 100 foot rip down the middle of the belt. (Peternel Dep. p. 65-69.) CNX was forced to replace the entire conveyer belt, which shut down all operations at CNX for three days. (Id. at 72.) Then, as soon as the conveyer belt was replaced, a major snowstorm hit Baltimore and shut down all CNX operations for a further two days. (Id. at 72.) CNX was forced to shut down completely for an additional 2 to 3 days beginning February 2nd for further repairs to the conveyer belt system, which was still being damaged by chunks of frozen coal. (Id. at 80-81.) Due to these events and to the continuing delays associated with unloading the frozen coal that was accumulating at CNX while CNX was unable to unload it, on February 4th CNX declared force majeure retroactive to January 19th. (Id. at ex. 9.) CNX also stated that it was not yet free of the force majeure, and that it would advise its customers when the force majeure was lifted.

The events at CNX also impacted Norfolk Southern. As the Court has noted, the accumulation of railcars at CNX reduced Norfolk Southern's supply of railcars available to load coal at mines and restricted Norfolk Southern's ability to schedule trains to load coal. Norfolk Southern began to fall behind on already-scheduled loadings, and on January 19th Norfolk Southern imposed a total embargo on permitting and loading coal at mines. (Joyner Dep. p. 83-84.) Four days later, on January 23rd, Norfolk Southern declared force majeure due to severe winter weather and the massive delays, congestion, and gridlock in the rail system caused by CNX's inability to unload the trains already at the terminal and inability to put empty railcars back into the rail system. (Peternel Dep. ex. 5.) On February 5th Norfolk Southern lifted its embargo on already-scheduled loadings,

but continued to strictly ration rail service and still refused to accept any new permits or to schedule any new loadings due to a severe backlog of already-filed permit requests. (Joyner Dep. p. 143-44.) Norfolk Southern refused to accept new permits or schedule more trains to load coal until CNX demonstrated that it had improved its unloading capacity. (Id. at 148.)

CNX formally lifted its force majeure on February 21st (Peternel Dep. ex. 9), but had still not returned to its normal unloading capacity. Due to the massive accumulation of backlogged trains at the terminal and the still-cold weather in Baltimore, CNX was still only able to unload between 2 and 3 trains per day. (Id. at 169-70.) Throughout late February and March, CNX operations gradually returned to normal. Norfolk Southern, however, felt the effects for a longer period. The backups and congestion in the rail system led Norfolk Southern to continue to ration permit requests and rail service, as Norfolk Southern prioritized loadings that had already been accepted and scheduled in early January over new permit and rail service requests. At the same time, Norfolk Southern attempted to accommodate new permit requests in such a manner as to avoid overscheduling, which would result in further congestion. (Joyner Dep. p. 158-60, 182.) It was not until late April that Norfolk Southern was fully free of the effects of these events and had returned to providing its normal levels of rail service. (Id. at 226.)

### 4. The Parties' Response to the Force Majeure Events

The events at CNX and Norfolk Southern's problems impacted the parties' performance under the Contract. Beginning in late January, as noted, Norfolk Southern refused to honor XCoal's permit requests, and consequently Plaintiff could not give Defendant a laycan to schedule loading coal onto Defendant's vessel. Thrasher kept in touch with both CNX and Norfolk Southern, and continually attempted to press Norfolk Southern into committing to honor his permit requests, to no

avail. (Joyner Dep. p. 130, ex. 34, 36.) When CNX declared force majeure on February 4th it sent a letter to Thrasher because he was a direct customer of CNX (unlike Plaintiff and Defendant), and Thrasher forwarded a copy of this letter to Hollars on February 7th. (Cornelius Dep. p. 223-25.) Thomson emailed Hollars on February 9th and asked about Plaintiff's ability to get coal to CNX, and in response Hollars informed him that CNX had declared force majeure and that Plaintiff would not be able to ship the coal as contemplated until at least March. (Hollars Dep. ex. 8.)

### a. Plaintiff's Declaration of Force Majeure and Defendant's Response

Consequently, on February 22nd Hollars, after consulting with Cornelius, wrote to Thomson and Donnelly and stated that Plaintiff was declaring force majeure on 33,333 tons of the 200,000 tons of coal specified in the Contract. (Hollars Dep. ex. 11.) Hollars stated:

> We have made every effort to obtain rail equipment and services from the Norfolk Southern Railroad to transport the coal from our mines to Baltimore without any success. There is a contract in place to move this coal with the railroad but at this time they are rationing equipment and services. . . . We did receive a notice from the Baltimore Terminal [CNX] on a belt failure that caused a massive backup on the rail system, which is attached. Per [Norfolk Southern] they had some 19 trains of frozen coal as a consequence of the belt problem and some very cold weather.

(Id.) Thomson responded on March 2nd and noted that he understood that CNX had lifted its force majeure the day before Hollars' letter, February 21st, and asked Hollars to "please advise as to your current rail schedule as [Defendant] needs to lift product ASAP." (Hollars Dep. ex. 12.) Nine days later, on March 11th, Defendant's Senior Solicitor Stephen Aftanas ("Aftanas") responded to Hollars' force majeure letter, reserved Defendant's right under the Contract to contest Plaintiff's declaration of force majeure, and asked for more information and clarification as to the basis for the force majeure declaration. (Hollars Dep. ex. 14.) Specifically, Aftanas noted that Hollars sent his letter after CNX lifted its force majeure, suggested that Plaintiff delayed in informing Defendant of

force majeure, and requested a more specific basis for declaring force majeure. (Id.) Further, Aftanas stated:

> [Plaintiff] has an affirmative obligation to eliminate the force majeure event or events affecting its performance under its contract with [Defendant]. [Defendant] has been provided with a vague prediction by [Plaintiff] that the force majeure event or events will affect deliveries under its contract with [Defendant] for the balance of 2005. This type of vague prediction does not acceptably live up to the terms of our agreement.
>
> Your declaration of force majeure refers to an amount of 33,333 tons being affected by the events constituting force majeure. We suggest this tonnage can be made up in the future under the balance of the term of the agreement between [Defendant] and [Plaintiff]. This is clearly contemplated in the rules governing shipments from [CNX] which state: "the parties . . . shall use reasonable efforts to schedule for makeup loadings any tonnages . . . scheduled for loading but not loaded at the Terminal due to events of force majeure suffered by either party."

(Id.)

Hollars responded to Aftanas on March 15th. (Hollars Dep. ex. 15.) Hollars denied any delay in informing Defendant of the force majeure declaration, and stated that there was no contradiction between CNX lifting its force majeure on February 21st and Plaintiff sending its force majeure letter on February 22nd, because CNX's force majeure declaration "precipitated a significant lack of service from the Norfolk Southern Railroad" (id.) and, in Hollars' opinion, as long as Norfolk Southern was not providing rail service, force majeure still existed (Hollars Dep. p. 111). As for the specific basis for declaring force majeure, Hollars stated that because Norfolk Southern was not providing rail service, no coal could be moved and Plaintiff could not perform under the Contract, despite the fact that Plaintiff at that time had approximately 900,000 tons of coal in inventory at the mines. Hollars specifically blamed Norfolk Southern's inability to provide rail service for Plaintiff's inability to deliver the coal, and stated that Plaintiff was continuing to press Norfolk Southern to provide service. (Id.) Regarding make up loadings, Hollars stated: "Unless we

see a major change in railroad service it is not likely that we will be able to make up the 33,333 tons." (Id.)

Aftanas did not respond to Hollars until July 26th, when he sent Hollars a letter stating that he had reviewed Hollars' March 15th letter and that Defendant was contesting Plaintiff's declaration of force majeure. Aftanas consulted with Thomson, who investigated Plaintiff's force majeure declaration and concluded that Plaintiff's stated reasons were not the true reasons for not supplying the coal (Thomson Dep. p. 142), when deciding to contest the force majeure declaration. Aftanas again indicated that Defendant wished "to resolve this matter on a commercial basis through makeup loadings[,]" and requested that Plaintiff advise Defendant of its intention and ability to schedule makeup vessel loadings. (Hollars Dep. ex. 36.) Hollars responded on August 9th and, after consulting with Cornelius and at Cornelius' instruction (Cornelius Dep. p. 265) said:

> It is regrettable that you have chosen to dispute our declaration of force majeure. Nonetheless, the terminal and railroad problems we encountered and notified you of clearly constitute an event of force majeure. The widespread failures of the railroad to perform its obligations in the east affected the entire coal industry and were regular topics in multiple coal publications. We do not intend to make these tons up.

(Hollars Dep. ex. 37.)

### b.  Defendant's Purchase of Replacement Coal

When Hollars informed Thomson on February 9th of CNX's force majeure and said that Plaintiff would not be able to ship coal as contemplated, Thomson (unbeknownst to Plaintiff) began looking to purchase replacement coal due to concerns about Defendant's inventory levels, and specifically the inventory levels at Defendant's Trenton 5 facility. (Thomson Dep. p. 173.) Defendant's Fuel Procurement Policies and Procedures Manual, which Thomson was required to follow (id. at ex. 3, p. 41-42), states that the target fuel inventory for all of Defendant's facilities is

enough fuel to provide 65 to 75 days of fuel burning.  (Id. at 75.)  The Manual did not state a specific requirement for the Trenton 5 facility, but Defendant's practice was to maintain a six week inventory of coal at Trenton 5.  (Id. at 157-59.)  An inventory report prepared by one of Defendant's employees, Beth McCormack (id. at 50), showed that the Trenton 5 facility had very low levels of coal inventory in January and February 2005 (id. at ex. 4, p. 158) and Thomson calculated that Defendant would be out of inventory by the end of March (an opinion that Thomson communicated to Hollars on February 11th) (Hollars Dep. ex. 8).  Due to the low inventory levels Thomson, as the Solid Fuels Manager, made the decision to purchase replacement coal to improve the inventory levels at the Trenton 5 facility (Thomson Dep. p. 79).

Thomson entered into negotiations with Transcor, a coal brokerage firm that buys coal from mining companies under short term agreements and resells it (Hollars Dep. p. 83), shortly after Hollars' February 9th email.  (Thomson Dep. p. 173.)  On March 7th Thomson signed a contract with Transcor for approximately 30,000 tons of coal to be shipped in early April at $65.00 per ton fob at Defendant's dock (id. at 86-87; Def. Mot. Summ. J. ex. BB, doc. # 31), and on March 24th Thomson signed a second contract with Transcor for approximately 60,000 tons of coal to be shipped in late May or early June at $65.00 per ton fob at Defendant's dock (Thomson Dep. p. 88; Def. Mot. Summ. J. ex CC).  These shipments were made on April 11th and May 9th.

Although neither party realized it at the time, the coal that Transcor sold to Defendant had been supplied by Plaintiff.  In March 2005 Plaintiff signed a short term contract with Transcor for the sale of coal, as Plaintiff was trying to move some of the coal that it had available and that could not be moved east to Baltimore due to the congestion in the rail system.  (Hollars Dep. p. 84.)  Transcor had access to rail service north to Ashtabula, Ohio on Lake Erie, and negotiated with

Plaintiff to purchase some of the coal that Plaintiff had available. Transcor never told Plaintiff who it would be reselling the coal to, and Plaintiff never asked Transcor who the ultimate customer would be. (Id. at 89-90.) Plaintiff simply provided the coal at the mine, and Transcor loaded it onto trains and shipped it off to the ultimate customer, which in this case happened to be Defendant. (Id. at 91.)

### 5. The Parties' Continuing Efforts to Ship Coal Under the Contract

#### a. The First Loading

Despite the problems caused by the force majeure events, Plaintiff and Defendant still attempted to negotiate the schedule for the first shipment of coal under the Contract. In February Hollars and Thomson explored the possibility of shipping the coal through Lake Erie, but abandoned that idea when Norfolk Southern refused to provide rail service and other rail carriers quoted rates that were too high. (Id. at 81-82.) Hollars and Thomson kept negotiating with Norfolk Southern, and by mid-March Norfolk Southern was saying that, while the March schedule was completely full, it might be possible to schedule a train in early April. (Joyner Dep. ex. 60.) Hollars kept Thomson apprised (Hollars Dep. p. 130) and, after several more brief delays by Norfolk Southern, Norfolk Southern honored the permit requests and on April 11th Plaintiff loaded approximately 13,000 tons of coal on a train for CNX. (Hollars Dep. ex. 21.) Two more trains loaded in late April and early May, and by then Plaintiff had approximately 35,000 tons of coal in the CNX stockyards waiting to be loaded onto a vessel.

Thomson began attempting to schedule a vessel to load coal at CNX. Defendant initially wanted to load a 70,000 ton vessel, but CNX did not have enough storage space in its yards to accommodate that much coal (id. at 154) and so Thomson eventually requested a laycan for the M/V

Ambassador for June 15th through the 24th, with an ETA of June 23rd. XCoal communicated this information to CNX and nominated the M/V Ambassador on June 7th, and CNX accepted the nomination and the laycan on June 8th. (Id. at ex. 28.) The ETA was later changed to June 15th, and on the 15th the M/V Ambassador loaded 35,493 tons of coal. Plaintiff invoiced Defendant for this shipment on June 20th (Def. Mot. Summ. J. ex. TT, doc. # 31), and Defendant paid the invoice in the amount of $1,504,354.97 on July 18th (Thomson Dep. p. 219.)

### b.      The Second Loading

Immediately after the first loading, Hollars and Thomson began negotiating the second loading. Hollars emailed Thomson on June 21st and asked for proposed dates for the second loading so that he could begin to request permits from Norfolk Southern, and Thomson replied the same day that Defendant would like to load a 70,000 ton vessel in early September. (Hollars Dep. ex. 33.) CNX did not have enough storage space for the coal required to load a 70,000 ton vessel, however (id. ex. 35), and so the parties attempted to schedule a smaller vessel in late September to early October. The parties eventually worked out an arrangement to load the M/V Atlantic Superior with approximately 30,000 tons of coal on October 2nd, and Defendant requested a laycan of September 29th to October 8th. (Id. ex. 42.) XCoal nominated the M/V Atlantic Superior to CNX and requested the laycan, and on August 29th CNX accepted the nomination and the laycan. (Id. ex. 43.) On October 6th the M/V Atlantic Superior loaded 33,484 tons of coal, which was delivered to Defendant on October 11th. Plaintiff invoiced Defendant in the amount of $1,554,237.99 on October 18th, and Defendant paid the invoice. (Def. Mot. Summ. J. ex. TT.)

### c.      The Third Loading

Just as after the first loading, the parties immediately began negotiating the next loading.

On October 6th Thomson proposed two possible loadings: approximately 60,000 tons on the M/V Yeoman Brook on November 5th, or approximately 35,000 tons on the M/V Ambassador on November 19th. (Hollars Dep. ex. 49.) Defendant preferred the M/V Yeoman Brook but could not arrange for the vessel to arrive on time, and so Defendant indicated to Hollars that "we should plan for the [M/V] Ambassador to be the next vessel into Baltimore." (Id.) The M/V Ambassador arrived as scheduled and loaded 35,276.91 tons of coal in mid-November, for which Plaintiff invoiced Defendant and Defendant paid $1,449,880.88. (Id. at ex. 53.)

### d. The Final Loading

The parties began negotiating the final loading even before the M/V Ambassador loaded its coal in mid-November. By the time the M/V Atlantic Superior loaded its coal on October 6, Plaintiff had delivered approximately 71,000 tons of coal with an additional 35,000 tons scheduled to load on the M/V Ambassador in November. Subtracting the disputed 33,333 force majeure tons from the Contract amount of 200,000 tons left approximately 59,000 tons to be loaded under the Contract. (Id. at ex. 49.) Defendant initially proposed two 35,000 ton loadings in mid to late December and early January 2006 (id. at ex. 51), but Plaintiff objected to extending the loadings into 2006. In emails to Defendant on November 14th Hollars stated that the parties' Contract only covered 2005 and, after consulting with Cornelius and in-house counsel, Hollars stated that Plaintiff would not extend the agreement into 2006. (Id.) Thomson responded the same day:

> Obviously I am very disappointed in your position and I think that it is important to note that it has been [Plaintiff's] inability to move coal from the mine to the port that is forcing these 2005 deliveries into 2006. On several occasions [Defendant] has offered to bring vessels to Baltimore but [Plaintiff] was unable to make the coal available. After the [M/V] Ambassador loads . . . [Plaintiff] will still be contractually obligated to provide [Defendant] with approximately [59,000 tons of coal] at Baltimore (not to mention the Force Majeure quantities which are still being disputed). Please advise immediately as to when [Plaintiff] will have the balance of

its contractual quantity available at Baltimore for [Defendant] to load so that we may load this quantity in 2005 as per your request.

(Id.) Hollars, after consulting with Cornelius and Robert Murray (Plaintiff's CEO) (Murray Dep. p. 155), responded the same day to Thomson and said "[a]fter considering your request we will accept the [January delivery date], provided [CNX] still has it available and that [Defendant] will pay any additional thruput [sic] charges that may apply to 2006 v. 2005."  (Hollars Dep. ex. 51.) Hollars testified that, in his opinion,

> the parties basically agreed to sell it [the January 2006 coal shipment] under the same terms as what the contract was [sic] . . . The way we looked at it was this was an accommodation for a customer.  It had not been - this had not gone the way either party would have particularly liked with stuff.  We felt like that [sic] was a good faith effort to try and, I guess, keep a good relationship with the customer by shipping the tons after the contract expired.

(Id. at 206-7; see also Murray Dep. p. 105-6, 155.)  Plaintiff's Complaint, however, alleges that this 2006 shipment "was the last shipment of coal to Defendant under the Contract."  (Compl. ¶ 18, doc. # 1.)

The parties eventually agreed to one 59,000 ton shipment, as opposed to two smaller ones. On December 8th Defendant informed Plaintiff that the M/V Yeoman Brook could load the remaining coal, and requested a laycan of January 5th to the 15th.  (Hollars Dep. ex. 56.)  CNX accepted the nomination and the laycan, and on January 15th the M/V Yeoman Brook loaded the remaining coal.

Plaintiff sent Defendant an invoice for $2,395,524.06 on January 24th.  (Def. Mot. Summ. J. ex. VV.)   Defendant, however, only paid Plaintiff $1,756,110.76, leaving a balance of $639,413.30, which Defendant asserted was the cost of the replacement coal that Defendant had purchased from Transcor in March 2005 to cover the 33,333 tons that Plaintiff did not deliver due

to the contested force majeure declaration.  (Thomson Dep. p. 198.)  Sidebottom, based on Thomson's recommendation, made the decision to withhold  the $639,413.30 (Sidebottom Dep. p. 19-21), which was a figure Thomson reached by subtracting the Contract coal price plus shipping costs from the cost of the Transcor coal, and then multiplying that price differential by the amount of the force majeure tons (Thomson Dep. p. 198-202).  This was the first time Plaintiff was notified of Defendant's purchase of replacement coal from Transcor.

### D.  Procedural History

Plaintiff filed its Complaint on February 3rd, 2006 and brought four causes of action: breach of contract, an action on an account, unjust enrichment, and fraud.  (Compl., doc. # 1.)  Plaintiff seeks to recover the $639,413.30 that Defendant withheld from its payment of the last invoice.  After a sufficient period of discovery, the parties each filed a Motion for Summary Judgment in September 2007.  (Pl. Mot. Summ. J., Sept. 14, 2007, doc. # 24; Def. Mot. Summ. J., Sept. 17, 2007, doc. # 30.)  These cross-motions for summary judgment prompted the parties to file a flurry of related motions seeking to strike affidavits and affirmative defenses and requesting protective orders and in camera reviews.  Plaintiff filed a Motion in Limine and to Strike Sixth Affirmative Defense on October 5th, 2007 (doc. # 34), and when Defendant's Response included an affidavit from Colin Thomson, Plaintiff filed a Motion to Strike Affirmation of Colin Thomson on November 12th, 2007 (doc. # 46).  Plaintiff also filed a Motion for Protective Order on November 5th, 2007 seeking to prevent Defendant from using certain documents produced during discovery (doc. # 44), which prompted Defendant to file a Motion to Compel In Camera Review on November 30th, 2007 to determine if Plaintiff's production of those documents constituted a subject-matter waiver (doc. 3# 49).  Additionally, Plaintiff filed a Motion to Strike Affidavit of Allison Donnelly on November 2nd,

2007 (doc. # 43).

Magistrate Judge Abel reviewed Plaintiff's Motion in Limine and to Strike Sixth Affirmative Defense, Motion to Strike Affirmation of Colin Thomson, and Motion for Protective Order, as well as Defendant's Motion to Compel In Camera Review, and issued an Order on July 1st, 2008. (Doc. # 58.) That Order granted in part Plaintiff's Motion in Limine and Motion to Strike, and granted Plaintiff's Motion for Protective Order, while denying as moot Defendant's Motion to Compel. (Id.) Defendant filed Objections to that Order on July 16th, 2008. (Doc. # 60.) All of the pending motions and objections have been fully briefed and are now ripe for adjudication. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

## II. Defendant's Objections to Magistrate Judge Abel's Order

As noted above, Magistrate Judge Abel's Order resolved four pending motions. Defendant now objects to the portions of the Order that found that it did not comply with a discovery order, that portions of Colin Thomson's affidavit contradict his deposition testimony, that Plaintiff's inadvertent disclosure of certain emails did not constitute a waiver of the attorney-client privilege, and that Plaintiff has established good cause to support granting a protective order thereby rendering Defendant's motion for an in camera review moot. (Def. Obj. p. 1-2, doc. # 60.)

### A. Standard Governing Review of the Magistrate Judge's Order

Federal Rule of Civil Procedure 72(a) provides that, when reviewing objections to a magistrate judge's ruling on a nondispositive matter, a district court must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." FED. R. CIV. P. 71(a). Rule 72(a) creates two standards of review: "The 'clearly erroneous' standard applies only to factual findings made by the magistrate judge, while . . . legal conclusions will be reviewed under the more lenient

'contrary to law' standard." <u>Gandee v. Glaser</u>, 785 F.Supp. 684, 686 (S.D. Ohio 1992) (Kinneary, J.). These standards "provide[] considerable deference to the determinations of magistrates." <u>In re Search Warrants Issued August 29, 1994</u>, 889 F.Supp. 296, 298 (S.D. Ohio 1995) (Holschuh, J.).

The Magistrate Judge's factual findings will be considered clearly erroneous if this Court

> on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The question is not whether the finding is the best or only conclusion that can be drawn from the evidence, or whether it is the one which [this Court] would draw. Rather, the test is whether there is evidence in the record to support the [Magistrate Judge's] finding, and whether [the Magistrate Judge's] construction of that evidence is a reasonable one.

<u>Heights Community Congress v. Hilltop Realty Corp.</u>, 774 F.2d 135, 140 (6th Cir. 1985). A legal conclusion would be contrary to law if this Court determines that Magistrate Judge Abel's legal conclusions "contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent." <u>Gandee</u>, 785 F.Supp. at 686.

## B.      Analysis

### 1.      Plaintiff's Motion in Limine and to Strike Defendant's Sixth Affirmative Defense

Defendant's sixth affirmative defense asserts: "Any monies allegedly due and owing to [Plaintiff] are subject to an offset and/or deduction for replacement costs as per the terms of the contract." (Answer ¶ 58, doc. # 4.) Defendant argues that it is not liable to Plaintiff for the $639,413.30 that Plaintiff seeks because paragraph 12 of the Contract allowed it to hold back the cost of the replacement coal it purchased from Transcor as a result of Plaintiff's allegedly unexcused failure to perform. (Def. Mot. Summ. J. p. 46, doc. # 30.) After the parties filed and briefed their respective motions for summary judgment, Plaintiff moved to strike this affirmative defense and to preclude "Defendant's introduction of any and all inventory records, inventory forecasting records,

and any and all documents relating to 'replacement or cover' goods it allegedly purchased because of the force majeure events that prevented Plaintiff from shipping coal." (Pl. Mot. Lim. and to Strike p. 1, doc. # 34.) Plaintiff alleges that Defendant failed to comply with a series of Magistrate Judge Abel's discovery orders and failed to produce documents entitled "Coal Model Reports," internal documents used by Defendant to forecast how much coal Defendant would need at a future time, and that Defendant's failure to disclose such documents relevant to its affirmative defense should result in the Court striking that affirmative defense. (Order p. 5, doc. # 58.)

Magistrate Judge Abel's Order first recounted the history of the parties' dispute regarding production of the Coal Model Reports. After Thomson first identified them in his deposition, Plaintiff requested their production and Magistrate Judge Abel ordered Defendant to produce the Coal Model Reports in February 2007. However, Defendant did not produce the full Coal Model Reports until August 2007, six months after Magistrate Judge Abel's February discovery order and also after the July 2007 discovery cut-off date. (Id. at 5-7.)

Magistrate Judge Abel found that Defendant "did not timely comply with my February 14, 2007 Order requiring production of the [Coal Model Reports]" (id. at 8) and then, after noting the discovery sanctions allowed by Rule 37, determined that an appropriate sanction would be to order "that [Defendant] be precluded from relying on the Coal Model [R]eports in opposing [P]laintiff's motion for summary judgment." (Id. at 10.) Magistrate Judge Abel also stated that, should the motions for summary judgment be denied, Plaintiff would be given the opportunity to conduct additional discovery related to the Coal Model Reports. Magistrate Judge Abel did not go so far as to strike Defendant's sixth affirmative defense, however, because Defendant "does not rely on the Coal Model [R]eports to support its [sixth affirmative] defense and [Plaintiff] has not pointed to any

affirmative use it might make of the reports" (id. at 9), thus granting in part Plaintiff's Motion in Limine and to Strike (doc. # 34).

Defendant now objects to Magistrate Judge Abel's factual determination that it did not comply with his February 2007 discovery order, and argues that its August 2007 disclosure should not result in sanctions in any form. (Def. Obj. p. 29, doc. # 60.) Defendant presents a detailed factual recitation of the parties' communications regarding the discovery dispute and attempts to justify the delay in producing the Coal Model Reports (id. at 26-28), but the Court agrees with Plaintiff's argument that Magistrate Judge Abel's factual findings were not clearly erroneous and that the sanction imposed is proper (Pl. Resp. to Obj. p. 4-5, doc. # 61).

Magistrate Judge Abel was well aware of and considered all the facts that Defendant presents regarding the parties' communications concerning the Coal Model Reports, as they were presented in Defendant's response to Plaintiff's Motion in Limine and to Strike (doc. # 42) and discussed in the Order. Magistrate Judge Abel's factual conclusion that Defendant did not comply with the February 2007 discovery order was a reasonable one, and there is substantial evidence in the record to support it. See, e.g., Heights Community Congress, 774 F.2d at 140. Moreover, the sanction imposed is a reasonable one, as it is limited to Defendant's specific use of the Coal Model Reports and does not preclude Defendant from relying on other evidence to support its sixth affirmative defense. This Court, after reviewing all the evidence, is not "left with a definite and firm conviction that a mistake has been committed[,]" id., and the Court thus **OVERRULES** Defendant's Objections to this portion of Magistrate Judge Abel's Order.

### 2.  Plaintiff's Motion to Strike Affirmation of Colin Thomson

This motion arose out of the parties' briefing of Plaintiff's Motion in Limine and to Strike

Defendant's Sixth Affirmative Defense. In its response to that motion, Defendant attached an Affirmation from Colin Thomson stating that he did not rely on the Coal Model Reports when deciding to purchase replacement coal from Transcor, and that he instead relied on a document identified during his deposition as Exhibit 4 and Bates Labeled as NSPI000248 ("Exhibit 4"), which contained inventory information, when deciding to purchase replacement coal. (Aff. of Colin Thomson, doc. # 42-2.) Plaintiff then moved to strike this Affirmation on the ground that it is inconsistent with Thomson's deposition testimony. (Pl. Mot. Strike Affirmation, doc. # 46.)

Magistrate Judge Abel first described the contents of the Affirmation and the relevant portions of Thomson's deposition testimony and then, after stating the applicable legal principle contained in Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 906-9 (6th Cir. 2006) (post-deposition affidavit should be stricken only if it directly contradicts prior sworn testimony), he compared each paragraph in the Affirmation to the deposition testimony to determine if the Affirmation contradicted the testimony in the deposition. (Order p. 10-19, doc. # 58.) Magistrate Judge Abel concluded that portions of the Affirmation's fifth paragraph, the entire sixth paragraph, and portions of the seventh paragraph contradicted Thomson's deposition testimony and struck those parts of the Affirmation. (Id. at 16-17.) Those portions of the Affirmation were struck because Magistrate Judge Abel concluded that they asserted that information related to Defendant's coal inventory existed in other documents and spreadsheets besides the Coal Model Reports and Exhibit 4, whereas in his deposition Thomson testified that no other spreadsheets or documents contained inventory information. (Id.) Magistrate Judge Abel found, however, that the remaining portions of Thomson's Affirmation did not contradict his deposition testimony and thus they were not stricken.

Defendant now objects to Magistrate Judge Abel's factual findings. (Def. Obj. p. 17-24, doc.

# 60.)  Essentially, Defendant argues that Magistrate Judge Abel misconstrued and misinterpreted Thomson's deposition testimony and his Affirmation (id. at 18-19, 21-24), and that Magistrate Judge Abel failed to realize that Exhibit 4 and the document Bates Labeled NSPI000248 are the same document (id. at 19-20).  Defendant argues that the Affirmation's references to other spreadsheets and documents were references to the Coal Model Reports and Exhibit 4 (which were both identified during Thomson's deposition) and not to other unidentified documents containing inventory information.  Defendant also asserts that the deposition testimony makes it clear that the document labeled NSPI000248 and Exhibit 4 are different documents, and that "Once one understands that 'Exhibit 4' and 'NSPI000248' are the exact same document . . . it is clear that Mr. Thomson's Affirmation and testimony are directly consistent with each other."  (Id. at 20.)

Defendant's arguments, however, are not persuasive.  The deposition testimony and the Affirmation are not models of clarity, due to a litany of interruptions and incomplete questioning by counsel for both parties during the deposition and due to Defendant's own admission that "The Affirmation apparently did not do well explaining [its intended point]."  (Id. at 18 n. 9.)  Faced with this confusion, Magistrate Judge Abel made his factual determinations based on the documents and testimony before him.  Defendant presents alternate interpretations of the testimony, but the question is not whether Magistrate Judge Abel's findings are the only ones, or even the best ones, that can be drawn from the evidence; the question is whether those determinations were reasonable and were supported by evidence in the record.  Heights Community Congress, 774 F.2d at 140.

The Court finds that Magistrate Judge Abel's factual findings were indeed reasonable and supported by evidence in the record.  Similarly, it is clear that Magistrate Judge Abel understood that Exhibit 4 and NSPI000248 are the same document.  A magistrate judge's factual findings are

entitled to "considerable deference," <u>In re Search Warrants Issued August 29, 1994</u>, 889 F.Supp. at 298, and this Court, after reviewing all the evidence, is not "left with a definite and firm conviction that a mistake has been committed[,]" <u>Heights Community Congress</u>, 774 F.2d at 140. The Court thus **OVERRULES** Defendant's Objections to this portion of Magistrate Judge Abel's Order.

### 3. Plaintiff's Motion for Protective Order

Plaintiff's Motion for Protective Order (doc. # 44) was filed in response to Defendant's decision to submit, as an exhibit to Defendant's Reply in Support of its Motion for Summary Judgment (doc. # 41), an email from Hollars to Plaintiff's in-house counsel (the "Hollars email"). Plaintiff states that the Hollars email is a privileged attorney-client communication that was inadvertently disclosed, and Plaintiff's Motion asks the Court to strike the Hollars email from the record and to enter a protective order.

Magistrate Judge Abel's Order begins by noting that, pursuant to FED. R. EVID. 501, state law governs the resolution of whether the Hollars email is a privileged communication, and that Ohio and most federal courts use a five factor balancing test, as described in <u>Nilavar v. Mercy Health Systems-Western Ohio</u>, No. 3:99-cv-612, 2004 WL 5345311, *3 (S.D. Ohio March 22, 2004) (Rice, J.) (evaluating the reasonableness of precautions taken to prevent disclosure, the number of disclosures, the extent of the disclosures, the promptness of measures taken to remedy the disclosures, and the overriding interests of justice), to determine whether an inadvertent disclosure waives the attorney-client privilege.[1] <u>See also</u> <u>Miles-McClellan Constr. Co. v. Westerville Bd. of</u>

---

[1] The Court notes that, subsequent to Magistrate Judge Abel's Order, Congress enacted FED. R. EVID. 502, which creates a national standard governing the effect of inadvertent disclosures on the attorney-client privilege. <u>See</u> Pub. L. No. 110-322, 122 Stat. 3537 (2008). When enacting this new rule, Congress provided that it "shall apply . . . insofar as is just and practicable, in all proceedings pending on such date of enactment [Sept. 19, 2008]." <u>Id.</u> § 1(c).

<u>Educ.</u>, No. 05AP-1112, 2006 WL 1817223, *5 (Ohio App. 10th Dist. June 30, 2006) (describing

same five factor balancing test). Magistrate Judge Abel next considered the circumstances

surrounding the Hollars email and concluded that the Hollars email was in fact a privileged attorney-

client communication because Hollars was asking for advice, from his attorney, about how to

respond to an email that Aftanas, Defendant's in-house attorney, had sent to Hollars. (Order p. 25-

26, doc. # 58.) Magistrate Judge Abel then moved on to consider the five factor <u>Nilavar</u> test, and

concluded that Plaintiff's inadvertent disclosure of the Hollars email did not waive the attorney-

client privilege. The Order finds that Plaintiff took reasonable precautions to avoid inadvertent

disclosures by having two attorneys review documents prior to production (<u>id.</u> at 26); that

inadvertent production of one document out of over 2,000 documents produced does not weigh in

favor of waiver (<u>id.</u>); that the extent of the waiver was not great because the document had not

worked its way into the fabric of the litigation (<u>id.</u> at 27); that Plaintiff took prompt measures to

rectify the disclosure (<u>id.</u> at 27-28); and that the overriding interests of justice and fairness did not

---

The Court finds that it is "just and practicable" to apply Rule 502 in this case because the
standard it creates is well-established and consistent with the five factor test that Magistrate
Judge Abel used, and thus its application would have no effect on this Court's review of
Magistrate Judge Abel's Order. Rule 502(b) states that "When made in a Federal proceeding . . .
[a] disclosure does not operate as a waiver in a Federal . . . proceeding if: (1) the disclosure is
inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent
disclosure; and (3) the holder promptly took reasonable steps to rectify the error[,]" FED. R.
EVID. 502(b), and the Advisory Committee Note states that, when determining the effect of an
inadvertent disclosure, courts should consider "the reasonableness of precautions taken, the time
taken to rectify the error, the scope of discovery, the extent of disclosure and the overriding issue
of fairness." These are the same factors set forth in the <u>Nilavar</u> test that Magistrate Judge Abel
applied, and thus the Court finds that, even though Rule 502 should apply to this case,
Magistrate Judge Abel's application of the <u>Nilavar</u> test was not contrary to law. <u>See also</u> <u>Rhoads
Industries, Inc. v. Building Materials Corp.</u>, __ F.R.D. __, 2008 WL 4916026 (E.D. Pa. Nov. 14,
2008) (noting enactment of Rule 502 but continuing to analyze the effect of an inadvertent
disclosure using the five factor balancing test because Rule 502 did not alter the analysis and
concluding that inadvertent disclosure of over 800 emails did not waive privilege).

conclusively counsel in favor of waiver (id. at 28-29).

Defendant objects to all of Magistrate Judge Abel's findings and conclusions. Defendant initially objects to the finding that the Hollars email is a privileged communication, because Defendant argues that Hollars was simply reciting the underlying facts of the case and was explaining reasons for actions that Hollars had already taken. (Def. Obj. p. 3-4, doc. # 60.) Defendant next argues that, even assuming the Hollars email is privileged, Plaintiff has waived the privilege through its inadvertent disclosure and objects to Magistrate Judge Abel's factual findings and legal conclusions. Defendant first argues that Magistrate Judge Abel did not discuss several cases that Defendant cited to and relied on in its brief opposing Plaintiff's motion, which in Defendant's opinion makes the Order contrary to applicable law (id. at 4-7), and then takes issue with many of the factual findings and legal conclusions that Magistrate Judge Abel made while discussing the five factor Nilavar analysis. Defendant argues that Plaintiff did not take adequate precautions to avoid inadvertent disclosure and notes that other courts, when reviewing similar facts, have held that a waiver occurred (id. at 7-8); that Magistrate Judge Abel did not consider the fact that Plaintiff disclosed the Hollars email twice, and that many other courts have held that a small number of disclosures can result in a waiver, which makes the number of disclosures weigh in favor of waiver (id. at 8-10); that the Hollars email has in fact worked its way into the fabric of the litigation and that the extent of the disclosure is thus large and weighs in favor of waiver (id. at 10-14); that Magistrate Judge Abel improperly found that Plaintiff took prompt measures to rectify the disclosure, and that his conclusion is not supported by facts (id. at 14-15); and that Magistrate Judge Abel failed to consider circumstances and facts indicating that the overriding interests of justice and fairness weigh in favor of waiver (id. at 15-16).

The Court does not find Defendant's arguments persuasive. The fact that Magistrate Judge Abel did not explicitly address the cases that Defendant relied on in its briefs does not make the Order contrary to law, because the cases that Defendant relied on are not mandatory authority on this Court or Magistrate Judge Abel. Defendant cited to and relied on Koch Materials Co. v. Shore Slurry Seal, Inc., 208 F.R.D. 109 (D. N.J. 2002), Fidelity and Deposit Co. of Maryland v. McCulloch, 168 F.R.D. 516 (E.D. Pa. 1996), and Evenflo Co., Inc. v. Hantec Agents Ltd., No. 3:05-cv-346, 2006 WL 2945440 (S.D. Ohio 2006). Neither Magistrate Judge Abel nor this Court, however, is required to follow the holdings in any of these cases: only published opinions of the Sixth Circuit and the Supreme Court of the United States are mandatory, binding opinions that courts in this district must follow. Magistrate Judge Abel's Order is not contrary to law simply because he declined to specifically address and distinguish the non-binding cases Defendant cited in one of its briefs, and he did not ignore applicable, binding law. See Gandee, 785 F.Supp. at 686.

Defendant's objections to the Order's findings in the Nilavar analysis likewise are not well taken. Magistrate Judge Abel's factual finding that Plaintiff had taken reasonable precautions to avoid inadvertent disclosure is a reasonable finding based on the evidence that two attorneys reviewed all documents before they were produced. The fact that other, non-binding court opinions have found differently does not mean that Magistrate Judge Abel's finding is clearly erroneous. The same is true for the Order's findings related to the number of disclosures. Defendant's arguments related to the extent of the disclosure do not convince the Court that Magistrate Judge Abel's findings are erroneous; the issue of why Plaintiff declared force majeure may be central to this litigation, but the Hollars email specifically is in no way inextricably woven into the fabric of the litigation, as it has never been extensively used or relied on by Defendant. There is also evidence

in the record to support the Order's conclusion that Plaintiff took prompt measures to rectify the inadvertent disclosure, as Plaintiff immediately objected when Defendant attempted to introduce the Hollars email at a deposition and again when Defendant attached the Hollars email to its reply brief. (Order p. 27-28, doc. # 58.) Magistrate Judge Abel's finding that the overriding interests of justice and fairness came out neutral is also supported by sufficient evidence in the record, such as the fact that Plaintiff's counsel returned many documents that Defendant inadvertently produced and Plaintiff did not attempt to use those documents.

In short, Magistrate Judge Abel's legal conclusions were not contrary to and did not contradict or ignore applicable law, and thus the Order was not contrary to law. Additionally, the factual findings were reasonable and were supported by evidence in the record. This Court cannot say that it is left with a "definite and firm conviction that a mistake has been committed[,]" <u>Heights Community Congress</u>, 774 F.2d at 140, and the Court thus **OVERRULES** Defendant's objections to this portion of the Order.

### 4. Defendant's Motion to Compel In Camera Review

Defendant's Motion to Compel (doc. # 49) asks the Court to conduct an in camera review of all of Plaintiff's privileged documents to determine the extent of Plaintiff's waiver of the attorney-client privilege. Because he concluded that Plaintiff's inadvertent disclosures did not waive the attorney-client privilege, Magistrate Judge Abel denied Defendant's Motion to Compel as moot. (Order p. 30, doc. # 58.) Because this Court has upheld Magistrate Judge Abel's conclusion with regards to the effect of Plaintiff's inadvertent disclosures, the Court also agrees that Defendant's Motion to Compel is moot.

### III. Plaintiff's Motion to Strike Affidavit of Allison Donnelly

In addition to the motions resolved by Magistrate Judge Abel's Order, Plaintiff has also filed a Motion to Strike Affidavit of Allison Donnelly. (Doc. # 43.) In its reply brief in support of its motion for summary judgment (doc. # 41), Defendant filed an affidavit from Allison Donnelly, who was Defendant's Solid Fuels Commercial Manager until February 2005 and who negotiated the Contract on Defendant's behalf. In her affidavit, Donnelly states that Defendant "understood and intended" that the CNX Load Port Terms, including the Load Port Terms force majeure provision, were incorporated into the parties' Contract, governed Plaintiff's performance at CNX and under the Contract, and governed the effects of a force majeure declaration at CNX. (Donnelly Aff. ¶¶ 3-6, doc. # 41-4.) Plaintiff moved to strike this affidavit on the grounds that it contradicted Donnelly's deposition testimony; that it impermissibly introduced new evidence in a reply brief in violation of one of this Court's local rules, S.D. OHIO CIV. R 7.2(d); and that it constituted inadmissible parol evidence concerning an integrated agreement. (Pl. Mot. Strike Affidavit, doc. # 43.) As explained below, the Court finds that it need only consider the last ground.

The parol evidence rule is a common law doctrine that prohibits a party who has entered into a written contract to contradict the terms of that contract or agreement through the introduction of evidence extraneous to the contract. Ed Schory & Sons, Inc. v. Soc. Natl. Bank, 75 Ohio St. 3d 433, 440, 662 N.E.2d 1074 (1996).

> When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence . . . of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

Id. The parol evidence rule will not bar extrinsic evidence concerning contract interpretation, however, if the written contract is ambiguous or unclear. S. Rosenthal & Co., Inc. v. Hantscho, Inc., 961 F.2d 1579 (Table), 1992 WL 102501 *2 (6th Cir. April 29, 1992). If a court finds that

contractual language is ambiguous, then the court may consider extrinsic evidence to interpret the contract and ascertain the parties' intentions, understandings, and agreements.

As noted below in section IV.B.3.b.i *infra*, the Court finds that the terms of the Contract are clear and unambiguous. Because the Contract terms are clear, Donnelly's affidavit is irrelevant parol evidence, and the Court **GRANTS** Plaintiff's Motion to Strike (doc. # 43) on this ground.

## IV.    Cross-Motions for Summary Judgment

Plaintiff's Complaint lists four claims: breach of contract, a cause of action on an account, unjust enrichment, and fraudulent inducement. (Compl. ¶¶ 22 - 49, doc. # 1.) Each party has moved for summary judgment on all claims.

### A.    Summary Judgment Standard

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material

fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. Taft Broad. Co. v. United

<u>States</u>, 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." <u>Id.</u> (citations omitted).

**B.    Analysis**

**1.    Unjust Enrichment**

Although it is the third count listed in Plaintiff's Complaint, the Court will consider Plaintiff's claim for unjust enrichment first. This claim, like all of Plaintiff's claims, is governed by Ohio law.[2] Plaintiff's Motion for Summary Judgment simply argues that "[Defendant] was unjustly enriched. It received the benefit of coal delivered by [Plaintiff] for which it did not pay. Because it was unjustly enriched, even absent the Contract, [Defendant] is liable to [Plaintiff] for

---

[2] This Court's jurisdiction is premised on diversity of citizenship, and when sitting in diversity federal courts generally apply the law of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941). Additionally, in this case the Contract contains a choice of law provision stating that Ohio law applies (Contract at ¶ 15) and both parties agree that Ohio law applies. (Pl. Mot. Summ. J. p. 7, doc. # 24; Def. Opp'n. p. 5 n. 3, doc. # 35.) When deciding a diversity case under state law, a federal court must apply the law of that state's highest court. <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64 (1938); <u>Garden City Osteopathic Hospital v. HBE Corp.</u>, 55 F.3d 1126 (6th Cir. 1995). When a district court, sitting in diversity, is deciding a question of state law, and the state's highest court has not decided the applicable law, then the federal court must consider "all relevant data" in ascertaining the state law. <u>Garden City</u>, 55 F.3d at 1130. The Sixth Circuit has concluded that relevant data include that state's appellate court decisions:

> [W]e are mindful that an intermediate appellate court's judgment that announces a rule of law is "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

<u>Id.</u> (citations omitted). Further, "relevant data also include the state's supreme court dicta, restatements of the law, law review commentaries, and the majority rule among other states." <u>Id.</u> (citation omitted).

quantum meruit recovery - the reasonable value of the coal delivered." (Pl. Mot. Summ. J. p. 15, doc. # 24.) Defendant argues that the Court should grant it summary judgment on the unjust enrichment claim because of the existence of the parties' express Contract that governs the subject matter of this dispute, *i.e.* the sale and shipment of coal from Plaintiff to Defendant. (Def. Opp'n. p. 15, doc. # 35.) In response to Defendant's argument Plaintiff argues, for the first time, that the January 2006 shipment was *not* made pursuant to the Contract, but instead was made pursuant to a fraudulently induced second and separate contract.[3]

### a. Relevant Law

"Unjust enrichment is an equitable doctrine in which the law implies a promise to pay the reasonable value of services rendered where one confers a benefit upon another without receiving just compensation for those services." Weiper v. W.A. Hill & Assoc., 104 Ohio App. 3d 250, 261, 661 N.E.2d 796 (1st Dist. 1995). The doctrine of unjust enrichment creates a contractual obligation, a "quasi-contract" where no express agreement in fact exists in order to prevent the injustice that arises "when one party retains a benefit from another's labors." Pawlus v. Bartrug, 109 Ohio App. 3d 796, 800, 673 N.E.2d 188 (9th Dist. 1996). "To recover for unjust enrichment under Ohio law, a plaintiff must prove that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit 'under circumstances where it would be unjust to do so without payment.'" Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 501 (6th Cir. 2003) (quoting Brown-Graves Co. v. Obert, 98 Ohio App. 3d 517, 648 N.E.2d 624, 627 (1991)).

"However, the doctrine of unjust enrichment cannot apply when an express contract exists."

---

[3] This is the subject of Plaintiff's fourth claim for relief, which the Court will discuss in section IV.B.2 *infra*.

<u>Homan, Inc. v. A1 AG Servs., LLC et al</u>, 175 Ohio App. 3d 51, 59, 885 N.E.2d 253 (3rd Dist. 2008). Because unjust enrichment is an equitable theory of recovery that implies a contractual obligation in the absence of an express agreement, when an express agreement does in fact exist concerning the subject matter of the dispute, the terms and parameters of that express agreement define the parties' liability and unjust enrichment is inapplicable. <u>See</u> <u>Pawlus</u>, 109 Ohio App. 3d at 800; <u>see also</u> <u>Aultman Hosp. Assn. v. Community Mut. Ins. Co.</u>, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920 (1989).

> **b.     Application**

Plaintiff's argument that the January 2006 shipment was made pursuant to a second, separate contract is not convincing.  Plaintiff's Complaint unambiguously states that "Plaintiff's last shipment of coal to Defendant under The Contract was delivered in January of 2006" (Compl. ¶ 18, doc. # 1), which is a clear admission that the parties' Contract governed the January 2006 shipment and which indicates that there is no separate contract.  Plaintiff has not provided a copy of this second contract to the Court or otherwise identified the second contract, and simply cites to Hollars' deposition testimony that "the parties basically agreed to sell it under the same terms as what the contract was, is the way we looked at it."  (Pl. Opp'n. p. 9, doc. # 40.)  This testimony is insufficient to establish the existence of a second contract and is also insufficient to satisfy Ohio's statute of frauds, which provides that

> a contract for the sale of goods for the price of five hundred dollars or more is not
> enforceable by way of action or defense unless there is some writing sufficient to
> indicate that a contract for sale has been made between the parties and signed by the
> party against whom enforcement is sought[.]

OHIO REV. CODE ANN. §1302.04 (LexisNexis 2002).  Even if Plaintiff was correct that a second contract existed, Plaintiff could not recover for unjust enrichment on that allegedly fraudulently-

induced contract due to Plaintiff's failure to satisfy the statute of frauds.

The facts of the case and Ohio law support the conclusion that the parties' original Contract governs the January 2006 shipment. The parties began negotiating what would become the January 2006 shipment in November 2005, when Defendant proposed two loadings in late December 2005 and early January 2006. (Hollars Dep. ex. 49.) Plaintiff objected on the ground that the terms of the Contract only covered shipments in 2005, and initially refused to extend the agreement into 2006. (Id.) Defendant responded, however, by pointing out that even setting aside the 33,333 disputed force majeure tons, as of November 2005 Plaintiff had only shipped approximately 106,000 of the 200,000 ton quantity specified in the Contract, and that Plaintiff still owed almost 60,000 tons of coal under the Contract. (Id.) In response to this, Plaintiff relented and accepted the January 2006 delivery date.

Even when viewed in the light most favorable to Plaintiff, these facts indicate that, at the time the agreement was made, the parties clearly contemplated that the January 2006 shipment would be made in satisfaction of the still-owing coal under the Contract.[4] Furthermore, Ohio law recognizes that "subsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified, neither consideration nor a writing is necessary." Citizens Fed. Bank, FSB v. Brickler, 114 Ohio App. 3d 401, 407, 683 N.E.2d 358 (2nd Dist. 1996). Thus, the parties were perfectly competent to agree in December 2005 to modify the terms of the Contract to allow for a delivery outside of the stated Contract term, and the fact that this agreement was not reduced to

---

[4] Any other course of action or argument by Plaintiff would have handed Defendant its own breach of contract claim: if the 60,000 tons delivered in January 2006 were not delivered in satisfaction of the Contract, subject to the remaining dispute concerning the effectiveness of the force majeure provision in the Contract, Plaintiff would still owe 60,000 tons of coal under the Contract that Defendant could make a claim for.

writing is of no import. In fact, the Contract even contemplates agreements changing the delivery dates: "Deliveries will be spread out evenly through the year *unless the parties mutually agree otherwise*." (Contract at ¶ 4 (emphasis added).)

The terms of the parties' agreed Contract thus govern the January 2006 shipment and any disputes that arise from it, which means that Plaintiff's cause of action for unjust enrichment cannot survive summary judgment. As a matter of law, "the doctrine of unjust enrichment cannot apply when an express contract exists[,]" Homan, Inc., 175 Ohio App. 3d at 59, see also Pawlus, 109 Ohio App. 3d at 800 (terms of express agreement, if applicable, define parties' liability and doctrine of unjust enrichment is inapplicable), and in light of the record evidence and Plaintiff's admissions in its Complaint, there is no genuine issue as to whether an express contract exists as modified by the agreement of the parties pursuant to the Contract, and the parties' Contract clearly governs the January 2006 shipment.[5] Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's claim for unjust enrichment, and Plaintiff's Motion for Summary Judgment is **DENIED** as to that claim.

## 2. Fraudulent Inducement

The fourth count in Plaintiff's Complaint alleges that Defendant fraudulently induced Plaintiff to make the January 2006 shipment. Plaintiff argues that it is entitled to summary judgment on its fraudulent inducement claim because "[t]he undisputed facts demonstrate [Defendant's]

---

[5] There is an exception in Ohio law that allows a party to recover for unjust enrichment even if an express agreement exists: if there is evidence of fraud, illegality, or bad faith, a party may maintain a claim for unjust enrichment. See Aultman, 46 Ohio St. 3d at 55. Plaintiff has in fact alleged fraudulent inducement, but because the Court finds that there is no evidence of fraudulent conduct or other illegality or bad faith, see section IV.B.2 *infra*, this exception does not save Plaintiff's unjust enrichment claim.

fraudulent conduct." (Pl. Mot. Summ. J. p. 17, doc. # 24.) According to Plaintiff's argument, Defendant knew the cost of the replacement coal it purchased from Transcor as early as April and June 2005, but never informed Plaintiff that it had purchased replacement coal and never informed Plaintiff that it intended to withhold payment on part of the January 2006 invoice (which Plaintiff argues the Contract did not allow Defendant to do). Instead, Plaintiff argues that Defendant induced Plaintiff to make further shipments, including one shipment outside the original Contract, by creating "a system of reliance and a course of dealing between the parties [i.e. shipping and paying for coal] which [Plaintiff] relied upon" when making the January 2006 shipment. (Id. p. 16.) Plaintiff also alleges that Defendant made an explicit promise to pay for the coal when, in December 2005, one of Defendant's employees named Beth McCormack ("McCormack") emailed Plaintiff and stated "You can send all invoices to my attention, and I will ensure that they are paid." (Id.) In sum, Plaintiff alleges that it relied on this promise as well as Defendant's course of conduct, which induced Plaintiff to make the January 2006 shipment, but that Defendant fraudulently concealed the material fact that it intended to withhold payment in violation of the Contract. (Id. at 15-17.)

Defendant argues that summary judgment should be granted in its favor because the January 2006 shipment was made pursuant to the original Contract, not a separate contract, and there is no evidence that Plaintiff was fraudulently induced to enter into the initial Contract (or any other contract). Defendant also argues that Plaintiff's fraud claim is simply an attempt to convert a breach of contract dispute into a tort claim, and that Plaintiff has not identified any fraud damages that are separate from the breach of contract damages. (Def. Mot. Summ. J. p. 36-41.)

### a.    Relevant Law

Under Ohio law, "a claim of fraud in the inducement arises when a party is induced to enter

into an agreement through fraud or misrepresentation. . . . A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful conduct induced a party to enter into the [agreement]." ABM Farms, Inc. v. Woods, 81 Ohio St. 3d 498, 502-3, 692 N.E.2d 574 (1998). A claim for fraudulent inducement (or fraud generally) requires proof by the plaintiff of:

> (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance.

Micrel, Inc. v. TRW, Inc., 486 F.3d 866, 874 (6th Cir. 2007) (citing Cohen v. Lamko, Inc., 10 Ohio St. 3d 167, 462 N.E.2d 407 (1984)). These elements are conjunctive, and thus Plaintiff must prove all elements to recover on its claim. Graham v. American Cyanamid Co., 350 F.3d 496, 507 (6th Cir. 2003). Additionally, "fraud damages [must] be limited to the injury actually arising from the fraud. The tort injury must be unique and separate from any injury resulting from a breach of contract." Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc., 212 F.3d 332, 338 (6th Cir. 2000).

### b. Application

After evaluating the evidence in the light most favorable to both Plaintiff and Defendant, the Court concludes that no reasonable jury could find for Plaintiff on its fraudulent inducement claim.[6]

---

[6] The Court notes that it has previously found that no second, separate contract existed for the January 2006 shipment, see section IV.B.1.b *supra*, and Defendant argues that this alone dooms Plaintiff's fraudulent inducement claim because Plaintiff has not identified any evidence of fraudulent inducement to enter into the initial Contract in December 2004. (Def. Mot. Summ. J. p. 37-39, doc. # 30.) The Court, however, believes that Plaintiff's claim can be read as alleging that Plaintiff was fraudulently induced to enter into the December 2005 *agreement* to modify the term of the original Contract, and the Court will evaluate the claim as such.

Consider the first element, "a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction[.]" <u>Micrel</u>, 486 F.3d at 874. Plaintiff first argues that McCormack's statement that she will ensure all invoices are paid is a false representation that Defendant would pay the January 2006 invoice in full (Pl. Mot. Summ. J. p. 16-17, doc. # 24), but when McCormack's statements are viewed in context the Court finds that no reasonable jury would agree. After the M/V Ambassador loaded a shipment of coal in mid-November, on December 15 one of Plaintiff's staff accountants emailed McCormack, one of Defendant's scheduling and logistics coordinators, and asked to whom the invoice for the M/V Ambassador should be sent and to whom Plaintiff should submit future invoices. (Dep. of Elizabeth McCormack ex. 58, doc. # 27 ("McCormack Dep.").) McCormack responded the same day and said: "You can send all invoices to my attention and I will ensure that they are paid." (<u>Id.</u>)

Viewed in its proper context, McCormack's statement was clearly only a response to Plaintiff's question about whom to send invoices to, not a promise that Defendant would pay all future invoices in full. It was thus clearly not a false representation. Furthermore, even if this statement could constitute a representation that future invoices would be paid, Plaintiff has not submitted any evidence relating to other elements of a fraudulent inducement claim: knowledge of the falsity of the representation and justifiable reliance upon the representation. <u>See</u> <u>Micrel</u>, 486 F.3d at 874. McCormack testified at her deposition that, at the time she responded to Plaintiff's email, she was not aware that Defendant's senior managers had decided to withhold payment from the January 2006 invoice. (McCormack Dep. p. 47.) Plaintiff has not refuted this testimony, and thus Plaintiff could not establish that McCormack knew her representation was false when she made it. Additionally, the Court finds that no reasonable jury could conclude that Plaintiff would have

been justified in relying on McCormack's representation, given that McCormack was a lower-level employee involved only with scheduling and logistics and had no authority over or input into Defendant's ultimate financial decisions and the decision over whether to withhold funds from the January 2006 invoice.

Next, Plaintiff argues that Defendant's decision to wait until the January 2006 shipment to inform Plaintiff of its purchase of replacement coal and to make its claim for the cost of that coal, when Defendant knew of the replacement coal's costs in April and May of 2005, was a concealment of a material fact, but the Court does not agree. For this "concealment" to support a claim for fraudulent inducement, Defendant must have had a duty to disclose the fact concealed. The Contract, however, imposes no duty on Defendant to immediately disclose that it purchased replacement coal, or to immediately disclose that it would make a claim for the cost of such coal or withhold payment from an invoice in satisfaction of that claim.

The relevant provision of the Contract provides, "Unless excused by Force Majeure, if [Plaintiff] fails to deliver all or part of the quantity specified [in the Contract], it will pay to [Defendant] an amount equal to the difference between the cost of replacing the non-delivered quantity and the contract price, if any." (Contract ¶ 12.) This provision does not require Defendant to make its claim for the cost of replacement coal at any specified time, and does not require Defendant to make its purchase of replacement coal known at any time before it makes a claim for the cost of such coal. Furthermore, the fact that Defendant had purchased replacement coal and intended to make a claim for the cost of that coal was not material to the parties' transaction, as is required under the first element of the Micrel test, see 486 F.3d at 874, because even if Defendant had made its claim as soon as it purchased the coal and withheld payment from an earlier invoice,

the parties would still have been contractually obligated to deliver and accept the remainder of the Contract quantity of coal. Plaintiff's argument that it "would not have made the first, much less the last, shipment of coal if it knew [Defendant] intended to withhold payment over the issue of the force majeure" (Pl. Opp'n. p. 18, doc. # 37) is not persuasive. No provision in the Contract gave Plaintiff the right to breach the Contract and cease performing just because Defendant made a claim for the cost of replacement coal; Plaintiff would still have been contractually bound to continue shipping coal under the Contract even if Defendant had immediately made its claim.

Defendant had no duty to disclose the fact that it intended to withhold payment from the January 2006 invoice due to its purchase of replacement coal earlier in 2005, because the parties' Contract imposed no such duty. The law occasionally imposes a duty to disclose even when a contract does not, but that duty only arises under law "when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." State v. Warner, 55 Ohio St. 3d 31, 54, 564 N.E.2d 18 (1990) (quoting Chiarella v. United States, 445 U.S. 222, 228 (1980)). There are no allegations of a fiduciary relationship or other similar relationship of trust between the parties; Defendant's "course of conduct" in accepting and paying for coal shipments (in other words simply performing under the Contract subject to the force majeure provision of the Contract) does not create a special relationship of trust between the parties, despite Plaintiff's arguments to the contrary. Defendant did not conceal a fact material to the transaction.

Plaintiff cannot satisfy the first element of its claim for fraudulent inducement, as no reasonable jury could conclude that Defendant made a false representation or concealed a fact material to the transaction. Because the elements are conjunctive, see American Cyanamid, 350

F.3d at 507, Plaintiff's failure to satisfy the first element of its claim dooms the entire fraudulent inducement claim and Defendant is entitled to summary judgment on this claim. Plaintiff's Motion for Summary Judgment is **DENIED** as to its claim for fraudulent inducement, and Defendant's Motion for Summary Judgment is **GRANTED** as to that claim.[7]

### 3. Breach of Contract

The Court now turns to the first and main count in Plaintiff's Complaint: breach of contract. (Compl. ¶¶ 22-24, doc. # 1.) Plaintiff alleges that it validly declared force majeure in February 2005, that its nondelivery of approximately 33,333 tons of coal was excused under the Contract's force majeure provision, and that Defendant's undisputed failure to pay the full amount of the January 2006 invoice constituted a breach of the Contract because the Contract did not give Defendant the right to setoff from the January 2006 invoice the amount of the replacement coal it purchased from Transcor. (Pl. Mot. Summ. J. p. 7-13, doc. # 24.) Defendant argues that Plaintiff did not perform under the Contract because it did not comply with the conditions that the Contract, specifically the Load Port Terms attached to the Contract as Schedule II, imposed on a party declaring force majeure. Defendant argues that Plaintiff had a contractual duty to make up the 33,333 tons of coal on which Plaintiff declared force majeure. Additionally, Defendant argues that

---

[7] Alternatively, the Court agrees with Defendant's argument that Plaintiff has not alleged any fraud damages separate and unique from the alleged breach of contract damages. (Def. Mot. Summ. J. p. 39-41, doc. # 30.) Plaintiff's claims all stem from Defendant's failure to pay the January 2006 invoice in full, which Plaintiff alleges is a breach of the contract. "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App. 3d 137, 151, 684 N.E.2d 1261 (9th Dist. 1996); see also Medial Billing, 212 F.3d at 338. Plaintiff has not alleged a separate fraud claim or separate fraud damages, and summary judgment is appropriate for Defendant on Plaintiff's fraudulent inducement claim for this reason as well.

46

the Contract did in fact give it the right to setoff the amount of the replacement coal from the January 2006 invoice, and thus that it did not breach the Contract. (Def. Mot. Summ. J. p. 42-46, doc. # 30.)

### a. Relevant Law

To successfully establish a breach of contract claim under Ohio law, a plaintiff must establish "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Doner v. Snapp, 98 Ohio App. 3d 597, 600, 649 N.E.2d 42 (1994). A party may establish the existence of a contract by simply presenting the written contract. Interpreting that contract's written terms is a matter of law that is decided by the court. Savedoff v. Access Group, Inc., 524 F.3d 754, 763 (6th Cir. 2008). The court must ascertain the intent of the parties, and "[t]he intent of the parties is presumed to reside in the language they choose to use in their agreement." Graham v. Drydock Coal Co., 76 Ohio St. 3d 311, 313, 667 N.E.2d 949 (1996). The whole writing must be considered when interpreting contractual terms, and the court must "give reasonable effect to every provision in the agreement." Stone v. Nat'l. City Bank, 106 Ohio App. 3d 212, 221, 665 N.E.2d 746 (8th Dist. 1995). This is also true when the contract incorporates other documents by reference: "'Where one instrument incorporates another by reference, both must be read together. . . . Courts should attempt to harmonize provisions and words so that every word is given effect." Fouty v. Ohio Dep. of Youth Servs., 167 Ohio App. 3d 508, 528, 855 N.E.2d 909 (10th Dist. 2006) (quoting Christe v. GMS Mgt. Co., Inc., 124 Ohio App. 3d 84, 88, 705 N.E.2d 691 (9th Dist. 1997)).

Ordinarily courts look only to the language in the contract, but when the court determines that the contractual language is ambiguous, extrinsic evidence relevant to the parties' intentions may be considered to resolve the ambiguity, and courts generally construe ambiguities against the drafter.

Savedoff, 524 F.3d at 763-64. Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." Covington v. Lucia, 151 Ohio App. 3d 409, 414, 784 N.E.2d 186 (10th Dist. 2003). Courts should be careful to avoid using extrinsic evidence to *create* an ambiguity; the ambiguity must be obvious on the face of the written contract. Id.

Once the terms of the contract are established, the plaintiff must prevent evidence that it performed under those terms, and that the defendant breached those terms. A party's performance under a contract is judged according to the contract's terms; likewise, "[a] party breaches a contract if [it] fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." Savedoff, 524 F.3d at 762.

### b. Application

### i. The Contract Terms

The Court begins by construing the terms of the Contract. The majority of the terms are not disputed and are unambiguously clear - terms such as the price for and quality of the coal. There are two main disputes as to contract interpretation, however: 1) the applicability of the Load Port Terms, specifically the force majeure provisions in the Load Port Terms and those terms' interaction with the force majeure provision in the Contract; and 2) whether the Contract permits Defendant to withhold payment from Plaintiff for the cost of replacement coal. Neither party contends that the Contract language is ambiguous; rather, each party argues that the Contract language clearly supports its preferred interpretation.

First, the Load Port Terms and the force majeure provisions. The parties' Contract, as noted, contains a force majeure provision that, in relevant part, states:

> Neither [Plaintiff] nor [Defendant] shall be in default for failure to perform its obligations under this [Contract] if such failure is caused due to events beyond its reasonable control. . . . The provisions of this clause shall not apply unless the party wishing to be relieved from liability has, promptly after the occurrence of the event or circumstance giving rise to the Force Majeure claim, notified the other party of its intention to claim relief, used all reasonable endeavors and continues to use all reasonable endeavors to rectify the event or circumstance giving rise to the Force Majeure claim and to minimize the damage caused by it.

(Contract ¶ 11.)

Paragraph 3, titled "Delivery," of the Contract references the Load Port Terms, and states:

"The load port terms of the [CNX terminal] shall apply to the Parties in respect of the transaction[.]"

(Id. ¶ 3.) The Load Port Terms, in turn, contain a force majeure provision that, in relevant part,

states:

> Each party [to the Load Port Terms] shall, in the event it experiences a force majeure provision, use all reasonable efforts to eliminate the force majeure and/or the effects thereof insofar as is practicable and economically feasible with all reasonable dispatch.
>
> * * *
>
> The parties hereto shall use reasonable efforts to schedule for makeup loadings any tonnages ("Force Majeure Tons") scheduled for loading but not loaded at the Terminal due to events of force majeure suffered by either party. Upon termination of the effects of any force majeure, [CNX] shall review the established vessel schedule, taking into consideration all Terminal customers, and shall advise Shipper of the feasibility of scheduling the Force Majeure Tons for a makeup loading time.

(Contract, Schedule II ¶¶ 11.3, .4.)

Plaintiff argues that the Contract's force majeure provision alone governs its declaration of

force majeure, and that the Load Port Terms do not apply. (Pl. Mot. Summ. J. p. 9-10, doc. # 24;

Pl. Opp'n. p. 8-12, doc. # 37.) According to Plaintiff, the "Contract referenced the Load Port Terms

solely for the limited purpose of explaining CNX's rules and regulations for delivery. The Load Port

Terms are therefore 'foreign to the contract for all other purposes' according to the law set forth in

Kraus v. Oscar Daniels Co., [61 Ohio App. 337, 342, 22 N.E.2d 544 (2d Dist. 1939)]." Plaintiff argues that the force majeure provision in the Load Port Terms is incompatible with and cannot trump the negotiated force majeure provision in the Contract. (Pl. Opp'n. p. 8-12, doc. # 37.)

Defendant emphasizes the language in paragraph 3 of the Contract, which states that the Load Port Terms "*shall apply* to the Parties in respect of the transaction[.]" (Contract ¶ 3 (emphasis added).) Defendant argues that this mandatory language clearly and unambiguously means that the Load Port Terms in their entirety applied to and "governed the performance of services at [CNX], which is where the force majeure events occurred." (Def. Mot. Summ. J. p. 43, doc. # 30.) Defendant argues that the Load Port Terms' force majeure provision applies to force majeure declarations stemming from events at CNX, and further notes that Plaintiff's force majeure declaration was based on the delays and effects of the force majeure events at CNX.

The Court finds that the Contract language is clear and unambiguous, <u>see</u> <u>Covington</u>, 151 Ohio App. 3d at 414, and that it clearly incorporates the Load Port Terms, including the Load Port Terms' force majeure provision. The Load Port Terms were not simply a "reference" or "specifications" describing the delivery process at CNX, as Plaintiff argues: the Contract clearly states that the Load Port Terms *shall apply* to the parties with respect to the delivery of coal at CNX, and does not limit their application with respect to the force majeure provision. In fact, the Contract does include some language limiting the applicability of the Load Port Terms in another respect: the Contract alters the Load Port Terms' definitions of what counts as vessel laytime and who is responsible for paying demurrage costs resulting from that laytime. (Contract ¶ 3.) The fact that the parties negotiated this one specific limitation, and no other, on the applicability of the Load Port Terms indicates that the remainder of the Load Port Terms should apply to the parties. If Plaintiff

50

had wished to further limit the applicability of the Load Port Terms to exclude the force majeure provision, that limitation could have been explicitly set forth in the Contract as well. The Contract contains no such limitation, however, and the Load Port Terms, including the force majeure provision, apply to and govern Plaintiff's contractual obligation to deliver coal to CNX and to load it onto Defendant's vessels.

Krause v. Oscar Daniels Co., cited by Plaintiff, does not compel a different result. The contractual language at issue in Krause explicitly and expressly limited the applicability of a reference to types of stone to be used in construction to certain defined issues, and that court did recognize that when "plans and specifications are referred to in the contract for a particular specified purpose, such specifications can serve no other purpose than the one specified[.]" Krause, 61 Ohio App. at 342. However, that is not the situation in this case, where the Contract contains no such language limiting the applicability of the Load Port Terms' force majeure provision. True, the reference to the Load Port Terms is in the section of the Contract titled "Delivery," and the Contract states that the Load Port Terms shall apply "in respect of the transaction," i.e. the delivery transaction, which indicates that the Load Port Terms should only apply to the delivery and loading of coal at CNX. The Court's interpretation, however, complies with this limitation: the obligations and procedures set forth in the Load Port Terms govern how Plaintiff is to deliver the coal to CNX and load it onto Defendant's vessels, and what steps Plaintiff must take to rectify events and situations affecting Plaintiff's performance of these delivery and loading obligations at CNX.

Plaintiff argues that the Contract and Load Port Terms force majeure provisions are incompatible and cannot be harmonized, but the Court finds that these two provisions, when read together, can be harmonized so that each provision is given effect. See Fouty, 167 Ohio App. 3d

at 528.  The Contract's force majeure provision states that the party declaring force majeure must use "all reasonable endeavors" to rectify the force majeure event.  (Contract ¶ 11.)  The Load Port Terms' provision that parties must make up loadings scheduled for loading at CNX but not actually loaded (Contract, Schedule II ¶ 11.5) defines what constitutes a "reasonable endeavor" to rectify the force majeure event.  When a force majeure event occurs at CNX, scheduling make up loadings would be, in the words of the Contract's force majeure provision, a "reasonable endeavor" to rectify the force majeure and its effects.  This interpretation gives effect to the Load Port Terms' force majeure provisions and the obligations it creates, while at the same time acknowledging that the Contract's force majeure provision, which requires the party declaring force majeure to use and continue to use all reasonable endeavors to rectify the force majeure event and minimize the damage caused by it, still applies and, ultimately, still governs when either party declares force majeure.

Second, withholding payment to cover the cost of replacement coal.  The relevant portion of the Contract states: "Unless excused by Force Majeure, if [Plaintiff] fails to deliver all or part of the quantity [of coal], it will pay to [Defendant] an amount equal to the difference between the cost of replacing the non-delivered quantity and the contract price, if any."  (Contract ¶ 12.)  Plaintiff argues that, rather than giving Defendant a right to withhold payment from the January 2006 invoice, this provision only gives Defendant the right to "notify [Plaintiff] of its replacement costs and demand payment for the same[,]" which claim would later be litigated by the parties.  (Pl. Opp'n. p. 13-14, doc. # 37.)  Defendant, on the other hand, argues that this provision gave it a "vested right to set off the amounts it paid to Transcor for the replacement coal" once Plaintiff failed to deliver part of the agreed-to quantity of 200,000 tons of coal.  (Def. Mot. Summ. J. p. 46, doc. # 30.)

The Court finds that this Contract provision is also clear and unambiguous, and that it grants

Defendant a right to set off the cost of the replacement coal it purchased from Transcor from the January 2006 invoice. Assuming for the purposes of contract interpretation that the failure to deliver the coal was not excused by force majeure, once Plaintiff failed to deliver the 33,333 tons during the Contract period Defendant did in fact had a right to recover from Plaintiff the difference in the cost between the Transcor replacement coal and the Contract coal.[8] The Contract language clearly states that, in the event that Plaintiff's nonperformance requires Defendant to purchase replacement coal, Plaintiff "*will pay*" the cost difference to Defendant. This mandatory language gives Defendant a vested right to payment that can be satisfied by simply offsetting the cost difference from a contractual invoice, which is exactly what Defendant did. Plaintiff's interpretation would add an unnecessary step to this process, requiring Defendant to pay money to Plaintiff and then immediately demand payment of that same money. If the claim is contested, as it is in this case, Plaintiff's interpretation would lead the parties to the same situation: in litigation, arguing about whether the failure to perform is excused and whether the claim is valid.

Plaintiff further argues that Defendant should have notified Plaintiff of its purchase of replacement coal and made its demand for payment as soon as it purchased the replacement coal from Transcor in April 2005. As the Court has already noted, however, see section IV.B.2.b *supra*, the Contract imposes no time limit on Defendant's exercise of its right to demand payment and set off the payment amount, and does not require Defendant to notify Plaintiff of its purchase of replacement coal when it makes that purchase.

The fact that Defendant waited until the end of the Contract period to make its claim and set

---

[8] Of course, if Plaintiff's performance was legitimately excused by force majeure, Defendant would not have a right to payment no matter how this provision is construed.

off the amount, moreover, makes sense in light of the parties' dispute. Defendant has maintained throughout this dispute that Plaintiff was obligated to make up the 33,333 force majeure tons, and repeatedly sought to resolve the issue on a commercial basis through make up loadings. The Contract only gives Defendant its right to payment if the coal is not delivered during the Contract period: in order to determine whether Plaintiff had failed to deliver part of the 200,000 ton Contract quantity of coal, Defendant had to wait until the end of the Contract period, which in this case was January 2006. If Plaintiff had relented and agreed to deliver the 33,333 tons then Defendant would have not had a claim for the cost of the replacement coal, but there was no way to tell whether Plaintiff would in fact deliver the 33,333 tons until the Contract period expired.

In sum, the Court finds that the Contract terms are clear and unambiguous. The Load Port Terms, including the force majeure provision contained therein, apply to and govern Plaintiff's delivery and loading of coal at CNX. The Load Port Terms' force majeure provision defines and clarifies the Contract's force majeure provision, specifically what constitutes a "reasonable endeavor" to rectify force majeure events that occur at CNX. Furthermore, assuming that Plaintiff's failure to deliver part of the Contract quantity of coal was not excused by force majeure, the Contract gave Defendant a right to recover the difference between the cost of replacement coal and the cost of the Contract coal, which right could be satisfied by setting off the cost difference from the final invoice under the Contract.

### ii. Plaintiff's Performance and Defendant's Breach

Having interpreted the Contract terms, the Court now turns to the questions of whether Plaintiff performed under, and whether Defendant breached, the Contract. Unlike contract interpretation, which is a matter of law, these are questions of fact that must be resolved by the

ultimate factfinder unless there is no genuine dispute as to the material facts. FED. R. CIV. P. 56(c); Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978).

Plaintiff argues that it is entitled to summary judgment because it fully performed under the Contract by delivering approximately 166,000 tons of coal, and because its nondelivery of the remaining quantity was excused by force majeure. Plaintiff argues that the events at CNX and Norfolk Southern were beyond its reasonable control, that it promptly notified Defendant of its intention to declare force majeure, and that it used all reasonable efforts to rectify the force majeure circumstances. Furthermore, Plaintiff asserts that Defendant breached the Contract by withholding $639,413.30 from the January 2006 invoice because Plaintiff's nondelivery of the 33,333 tons was excused by force majeure and Defendant had no right to set off that amount. Plaintiff contends that there is no dispute as to either its performance or Defendant's breach, and thus that it is entitled to summary judgment on its breach of contract claim. (Pl. Mot. Summ. J. p. 8-13, doc. # 24.)

Defendant, in turn, argues that it is entitled to summary judgment because Plaintiff breached the Contract by failing to schedule make-up loadings to replace the 33,333 tons that Plaintiff did not deliver in January and February 2005. Defendant argues that Plaintiff had a contractual obligation, imposed by the Load Port Terms' force majeure provision, to schedule such make-up loadings, and that Plaintiff's failure to do so means that Plaintiff's nonperformance was not excused by force majeure. Defendant contends that Plaintiff did not perform under the terms of the Contract, and thus that it is entitled to summary judgment on Plaintiff's breach of contract claim. (Def. Mot. Summ. J. p. 42-46, doc. # 30.)

After reviewing both motions for summary judgment, the Court concludes that genuine issues of material fact exist regarding Plaintiff's performance under the Contract that preclude

granting summary judgment to either party. As an initial matter, the Court rejects Defendant's argument that Plaintiff was required to schedule make-up loadings under the Load Port Terms, even though the Load Port Terms were a valid part of the parties' Contract. (Pl. Opp'n. p. 9, doc. # 37.) The Load Port Terms clearly indicate that make-up loadings will only be contractually required when coal *already scheduled for loading* is not loaded due to force majeure. (Contract, Schedule II ¶ 11.5.) Even when the evidence is viewed in the light most favorable to Defendant, Plaintiff is correct that there was never any coal actually scheduled for loading at CNX in January and February 2005. (Pl. Opp'n. p. 9, doc. # 37.) Undisputed record evidence in the form of emails and CNX vessel schedules indicate that there was never a vessel bound for Defendant scheduled to load coal at CNX when the force majeure events at CNX shut down the terminal. (See, e.g., Joyner Dep. ex. 18, 30, 50.) If there was never a vessel scheduled to load coal at CNX, there can be no coal loading to make-up and this provision of the Load Port Terms does not apply.

Defendant's argument that Thomson nomination of the M/V Ambassador in January 2005 means that coal was scheduled for loading is unpersuasive. (Def. Reply p. 25-26, doc. # 41.) Under the Contract terms, the shipper that contracts directly with CNX is responsible for nominating a vessel to CNX, not the entity that will ultimately receive the coal. The Contract clearly states that Plaintiff is the party responsible for transporting the coal from the mine to CNX and loading it onto the vessel. (Contract ¶ 3 ("[Plaintiff] shall transport the coal from the mine by railcar to the port of Baltimore and transfer the coal from the railcar into [Defendant's] vessel").) Plaintiff subcontracted with XCoal to perform these shipping duties, and XCoal is the entity that actually directly contracted with CNX. (Cornelius Dep. p. 107-8, 138-39, 179.) Thus, XCoal was the party responsible for nominating vessels to CNX, not Defendant. Under the terms and operation of the Contract,

Thomson's "nomination" of the M/V Ambassador, communicated to Hollars at Plaintiff, was simply a request for Plaintiff and XCoal to arrange for shipping to CNX and to nominate the M/V Ambassador to CNX, not the actual nomination and scheduling of a vessel at CNX. The later, successful shipments followed this pattern: Thomson would provide dates and vessel schedules to Plaintiff and XCoal, XCoal would nominate a vessel to CNX and request a laycan, and CNX would then accept the nomination and laycan from XCoal, not Defendant. (See, e.g., Hollars Dep. ex. 28.) Only then would a vessel actually be scheduled for loading at CNX.

Defendant's nomination of the M/V Ambassador in January 2005, communicated to Plaintiff, did not mean that the vessel was actually scheduled for loading at CNX, because the nomination was never communicated to CNX and the vessel was never scheduled at CNX. Thus, the make-up loading provision in the Load Port Terms' force majeure provision does not apply to the missed shipment of coal.

This does not necessarily mean, however, that Plaintiff's nonperformance under the Contract was excused. The Contract's general force majeure provision still applies, and genuine issues remain as to whether Plaintiff complied with its force majeure obligations. Plaintiff declared force majeure due to the force majeures declared by both CNX and Norfolk Southern: the delays and problems unloading trains at CNX caused a backup and congestion in Norfolk Southern's raillines, which led to Norfolk Southern issuing an embargo on rail permits and refusing to provide railcars to ship Plaintiff's coal. Because Norfolk Southern was the only railroad that provided service from southeastern Ohio to Baltimore, Norfolk Southern's refusal to honor Plaintiff's permit requests led to Plaintiff declaring force majeure due to its inability to ship coal. (Hollars Dep. p. 111, ex. 11.) Even when viewed in the light most favorable to Defendant these events were clearly outside of

Plaintiff's control, and the Court finds that there can be no genuine dispute as to the initial validity of Plaintiff's declaration of force majeure.

The Contract's force majeure provision also states, however, that a party will not be excused from performance due to force majeure unless that party "used all reasonable endeavors *and continues to use* all reasonable endeavors to rectify the event or circumstance giving rise to the Force Majeure claim *and to minimize the damage caused by it*." (Contract ¶ 11 (emphasis added).) After the force majeure events, Plaintiff alleges that it did everything it could to pressure Norfolk Southern into honoring Plaintiff's requests for rail permits, and also states that it explored the possibility of shipping coal through Lake Erie instead of Baltimore, to no avail. Plaintiff states that, despite its best efforts, Norfolk Southern did not begin providing rail service until late April, and thus the first shipment of coal under the Contract was not made until June. (Pl. Mot. Summ. J. p. 11, doc. # 24.) Defendant, however, argues that it repeatedly requested shipments of coal from Plaintiff and that Plaintiff consistently could not make those shipments or could only make smaller shipments. Defendant also argues that, as early as February 2005, Plaintiff indicated that it would not make any attempt to provide the entire Contract quantity of coal. (Def. Mot. Summ. J. p. 19-21, doc. # 30.) Plaintiff maintained this position into March 2005 when Hollars stated to Aftanas that it was "extremely unlikely" that Plaintiff would make up the 33,333 tons, and by August 2005 Plaintiff had affirmatively stated that it did not intend to ship the 33,333 missed tons. Defendant argues that these facts indicate that Plaintiff made no efforts, much less reasonable ones, to reschedule the missing tons, i.e. to minimize the damage caused by the force majeure. (Id. p. 24.)

Given these facts and competing claims, the questions of whether Plaintiff's efforts to rectify the effects of the Norfolk Southern rail permit embargo and CNX delays were reasonable, and

whether Plaintiff in fact used continuing reasonable efforts to minimize the damage caused to Defendant by not shipping 33,333 tons of coal under the Contract due to force majeure, are clearly issues for the finder of fact. Questions of reasonableness are quintessentially jury questions, and are not properly resolved by the Court on summary judgment. See, e.g., Niemi v. NKH Spring Co., Ltd. 543 F3d 294, 303 (6th Cir. 2008) (reversing grant of summary judgment in misappropriation of trade secrets case and stating "the reasonableness of [a party's] efforts is a question for the trier of fact"). Viewed in the light most favorable to Plaintiff, a jury could conclude that Plaintiff's efforts to secure rail service from Norfolk Southern were reasonable and that Plaintiff did in fact reasonably attempt to minimize the damage to Defendant by, for example, attempting to ship coal through Lake Erie instead of Baltimore. The jury could then conclude that Plaintiff's performance was excused by force majeure, and consequently that Defendant's withholding of funds from the January 2006 was a breach of the Contract. This precludes summary judgment for Defendant.

On the other hand, when the facts are viewed in the light most favorable to Defendant, the same jury could also conclude that Plaintiff's efforts to rectify the force majeure were insufficient and unreasonable, and that Plaintiff's initial reluctance and later outright refusal to ship the 33,333 force majeure tons means that Plaintiff did not use continuing reasonable efforts to minimize the damage the force majeure events caused to Defendant, as the Contract obliged Plaintiff to do. This would lead to the conclusion that Plaintiff's nonperformance was not excused by force majeure and that Defendant was entitled under the Court's interpretation of the Contract to withhold funds from the January 2006 invoice in satisfaction of the costs Defendant incurred when purchasing replacement coal. This precludes summary judgment for Plaintiff.

In sum, genuine issues of material fact, relating to the reasonableness of Plaintiff's attempts

to rectify the force majeure and to the reasonableness of Plaintiff's efforts to minimize the damage caused to Defendant by the force majeure, exist that preclude summary judgment for either party on Plaintiff's breach of contract claim. Plaintiff's Motion for Summary Judgment (doc. # 24) and Defendant's Motion for Summary Judgment (doc. # 30) are both **DENIED** as to Plaintiff's breach of contract claim.

### 4.      Action on an Account

The second count of Plaintiff's Complaint brings a cause of action on an account (Compl. ¶ 25-28, doc. # 1), and Plaintiff has moved for summary judgment on this count (Pl. Mot. Summ. J. p. 13-14, doc. # 24.)  An action on an account, however, "is founded upon contract and thus a plaintiff must prove the necessary elements of a contract action" before recovering on an account. Gabriele v. Reagan, 57 Ohio App. 3d 84, 87, 566 N.E.2d 684 (12th Dist. 1988).  Because genuine issues of material fact exist as to Plaintiff's breach of contract claim, summary judgment is likewise inappropriate on Plaintiff's action on an account.  Plaintiff's Motion for Summary Judgment (doc. # 24) is **DENIED** as to this claim.

### V.      Conclusion

For the reasons stated above, Defendant's Objections (doc. # 60) to Magistrate Judge Abel's Order are **OVERRULED**.  Plaintiff's Motion to Strike Affidavit of Allison Donnelly (doc. # 43) is **GRANTED**.  Plaintiff's Request for Oral Argument (doc. # 64) is **DENIED**.  Plaintiff's Motion for Summary Judgment (doc. # 24) is **DENIED** in whole, while Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

Date: February 23, 2009                    **/s/ John D. Holschuh**
                                           John D. Holschuh, Judge
                                           United States District Court